Bortz Coal Company *v*. Commonwealth.

442

Argued April 15, 1971, before President Judge BOWMAN, and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Fred C. Adams*, with him *Coldren & Adams*, for appellant.

*Morris J. Solomon*, Assistant Attorney General, with him *William M. Gross*, Assistant Attorney General, and *J. Shane Creamer*, Attorney General, for appellee.

OPINION BY JUDGE KRAMER, July 9, 1971:

This is an appeal by the Bortz Coal Company, appellant, (Bortz) from an adjudication (Abatement Order) of the Air Pollution Commission, appellee, (Commission) dated December 1, 1970, in which the Commission affirmed an air pollution abatement order (dated August 22, 1969) of the Department of Health under the Air Pollution Control Act, Act of January 8, 1960, P. L. 2119, 35 P.S. 4001, et seq.

The abatement order, in pertinent part, provides:

"(1) that the Bortz Coal Company shall on and after January 1, 1970, operate the beehive coke ovens at its Smithfield coke plant located in George's Township, Fayette County, in such a manner that the emissions from these operations do not exceed the limits set forth in Section 1.3 of Air Pollution Commission Regulation IV.

"(2) that the Bortz Coal Company shall on and after January 1, 1970, operate the coke pressure, conveyor belts, screens, truck hauling and dumping and open storage piles at its Smithfield coke plant located in George's Township, Fayette County, in such a manner that the air contaminants from these operations are not detectable beyond the plant's property line.

"(3) that the Bortz Coal Company shall on or before November 1, 1969, submit to the Department of Health a plan setting forth the procedures to be used to comply with paragraphs (1) and (2) of this Order. The plan is to contain a detailed description of the methods or devices to be used to control the air pollution."

The Commission in its adjudication of December 1, 1970, affirmed the abatement order of the Department quoted above in all particulars but extended the dates in paragraph (1) to January 1, 1971, and in paragraph (2) to June 1, 1971, and in paragraph (3) to February 1, 1971.

It is this latter adjudication from which Bortz appeals to this Court.

The record, including the transcript of the hearing before the Commission, reveals that Bortz has owned and operated 70 beehive coke ovens at its Smithfield coke plant for about 50 years. The ovens were built in 1898. Apparently the first discussions between the State air pollution authorities and Bortz concerning alleged air pollution violations by Bortz occurred in 1963. In 1965, Bortz was ordered to file a plan for the control of particulate matter emissions from its ovens. Bortz complied and filed such a plan. In 1969, the problem was again discussed with Bortz by the Region V Air Pollution Control Association.* Subsequent to the discussion with the Association, the Health Department issued the abatement order.

Bortz raises five issues which will be discussed and ruled upon in the enumerated paragraphs of this opinion.

Because of the fact that for all practical purposes this case represents the first venture of an appellate court of this Commonwealth into what in all probability will become a major development in the law, known generally as environmental law, we believe it would be beneficial to the bar and to the public, to the regulatory agencies, and to the courts, to make several preparatory comments.

Although one would be led to believe from the avalanche of recent publications on the subject of air pollution that it is something new, created by scientists and crusaded by modern youth, it should be pointed out that the law has been concerned with air pollution for centuries. As early as 1306, A.D., the use of "sea-

---

* The Association is specifically provided for in section 6 of the Act (35 P.S. 4006) and is composed of citizens from the air pollution region with certain enumerated powers and duties.

coal" (as distinguished from charcoal) as fuel was forbidden on penalty of death. *City of Portland v. Lloyd A. Fry Roofing Company*, 472 P. 2d 826 (1970) and Air Pollution: Its Control and Abatement, Kennedy and Porter; *8 Vand.* L. Rev. 854 (1954-55). During her reign, Queen Elizabeth of England forbade the burning of coal in London during sessions of Parliament, and in 1661 A.D., there was a plan to remove all industries in the city of London to its leeward side and to plant sweet-smelling flowers and trees on the windward side. See *Fumifugium*, National Smoke Abatement Society, Manchester, England (1953). Blackstone (Book III, Chapter 13, pages 167 and 217) describes the legal problems of a lead smelter, the fumes from whose plant were a nuisance, killing the neighboring farmer's corn. See 77 Eng. Rep. 816 and *Appeal of Pennsylvania Lead Company*, 96 Pa. 116 (1880).*

The point in citing these proofs of prior concern is merely to remind the reader that the law always provided for the protection against private nuisances. There is no doubt that because of the recent notoriety of the condition of the environment that there has been formed a new public policy in this State, as well as in other states of this Nation, that there is need for protection of the public against public nuisances.

That new policy is found in Section 2 of the Air Pollution Control Act, January 8, 1960, P. L. 2119, as amended, by the Act of June 12, 1968, P. L.    , No. 92, 35 P.S. 4002, which reads as follows: "It is hereby declared to be the policy of the Commonwealth of Pennsylvania to protect the air resources of the Commonwealth to the degree necessary for the (i) protec-

---

* Even William Shakespeare, over 300 years ago, placed the following words in the mouth of Hamlet, Prince of Denmark: "This most excellent canopy, the air, look you, this grave o'erhanging firmament . . . appeareth no other thing to me than a foul and pestulent congregation of vapors."

tion of public health, safety and well-being of its citizens; (ii) prevention of injury to plant and animal life and to property; (iii) protection of the comfort and convenience of the public and the protection of the recreational resources of the Commonwealth; and (iv) development, attraction and expansion of industry, commerce, and agriculture."

In carrying out this public policy, the Legislature created the Air Pollution Commission (35 P.S. 4005), under the Department of Health.** The Commission was directed by the Legislature to establish rules, regulations and standards for the enforcement of the Act. There can be no doubt from a reading of the Act that the legislative intent is to clean the air insofar as is reasonably possible under the police powers granted to the Commonwealth in both the State and Federal Constitutions.

It is well recognized as a principle of American jurisprudence that the Legislature may utilize the establishment of administrative agencies as a part of the legislative process in our tripartite system of government to regulate and control that segment of our society which the Legislature in its wisdom deems necessary of control. See *Metropolitan Edison Co. v. P.S.C.*, 127 Pa. Super. 11, 191 A. 678 (1937). The Legislature may not delegate its legislative function but it may authorize an agency to carry out the legislative intent described in general terms through rules, regulations and standards established by the agency. See *Belovsky v. Philadelphia*, 357 Pa. 329, 54 A. 2d 277 (1947). There are certain constitutional tests to determine whether or not the Legislature has gone too far in its delegation. For example, see *Cott Beverage Corp. v. Horst*, 380 Pa. 113, 110 A. 2d 405 (1955), *Commonwealth v. Zasloff*, 338

---

** As of January 19, 1971, these public authorities were combined in the new Department of Environmental Resources, Act of December 3, 1970, P. L.    Act No. 275.

Pa. 457, 13 A. 2d 67 (1940), and *Harris v. State Board of Optometrical Examiners,* 287 Pa. 531, 135 A. 237 (1926). The rules, regulations and standards of the regulatory agency must be reasonable, understandable, available, and must not violate the constitutional rights of any citizen.

Because of the well recognized problems involved in combining in administrative agencies all three functions of a tripartite form of government, viz., legislative, executive and judicial, the agencies and the courts must take care in carrying out their primary function of protecting the public, that they be vigilant to make certain that the individual citizen's rights in property and due process are not violated. Because it is common for the employees of the adjudicating regulatory agency to assume the role of prosecutor, witness and judge of the quasi-judicial functions of the agency, the courts must scrutinize the proceedings, the attitude and approach of the regulatory agency to assure that four centuries of well developed standards of fairness, procedure and substantive law are not washed away with the intense shower of exuberance and well meaning desires. Some environmental lawyers believe that the right to a decent environment may be within the penumbra of the unenumerated natural rights guaranteed by the Ninth Amendment of the United States Constitution. See *Griswold v. Connecticut,* 381 U.S. 479, 85 S. Ct. 1678 (1965). Some lawyers believe that the protection of the environment comes within the public trust doctrine. See 68 Michigan L. Rev. 471 (1970). Only time will tell how far environmental control of the air will be developed, but no matter how it is developed, it must be done within the framework of the law.

We turn now to the five issues raised in this case.

1. *The Air Pollution Control Act, supra, does not constitute an unlawful delegation of legislative au-*

*thority to the Air Pollution Commission and the Department of Health.*

The Pennsylvania Supreme Court has set down many times the guidelines for reviewing courts of this State to follow in cases where parties attempt to have a statute declared unconstitutional. In *Loomis v. Philadelphia School District Board of Education,* 376 Pa. 428, 431, 103 A. 2d 769, 770 (1954) the Court said: "Nothing but a clear violation of the Constitution will justify the judiciary in nullifying a legislative enactment. Every presumption must be indulged in its favor, and one who claims an Act is unconstitutional has a very heavy burden of proof. . . ."

In the case of *City of Philadelphia v. Depuy,* 431 Pa. 276, 279, 244 A. 2d 741, 743 (1968) the Court said: "We start with the well established proposition that one seeking to show a statute unconstitutional must carry a very heavy burden. This doctrine was most recently reiterated in Commonwealth v. Life Assurance Company of Pennsylvania, 419 Pa. 370, 214 A. 2d 209 (1965). . . . Moreover, the taxpayer's burden will be deemed met only if the challenged statute '*clearly, palpably,* and *plainly* violates the Constitution.' Daly v. Hemphill, 411 Pa. 263, 271, 191 A. 2d 835, 840 (1963)."

The appellant in this case has not met this heavy burden on any of the constitutional questions involved in this case.

With regard to the specific issue of an unlawful delegation of legislative power, we are referred to the case of *Dauphin Deposit Trust Company v. Myers,* 388 Pa. 444, 449, 130 A. 2d 686, 688 (1957) where the court said: "Where the standard fixed by the Legislature is not arbitrary or unlimited, but is definite and reasonable, the delegation of power or discretion will be sustained as constitutional. In considering the standard, regard must be had to the purpose and scope of the act, the subject matters covered therein, the duties pre-

scribed, and the broad or narrow powers granted, because those factors will often determine whether or not a sufficiently clear, definite and reasonable standard has been established." In the *Dauphin Deposit Trust Company* case, the Court held that the agency had exceeded the powers granted and reversed the action of the agency.

We hold that a careful reading of the Air Pollution Control Act, *supra,* indicates a sufficiently clear, definite and reasonable delegation of the powers to the Commission.

The statute, as amended, at 35 P.S. 4003(5) defines air pollution as: "(5) 'air pollution'. The presence in the outdoor atmosphere of any form of contaminant including but not limited to the discharging from stacks, chimneys, openings, buildings, structures, open fires, vehicles, processes, or any other source of any smoke, soot, fly ash, dust, cinders, dirt, noxious or obnoxious acids, fumes, oxides, gases, vapors, odors, toxic or radioactive substances, waste, or any other matter in such place, manner, or concentration inimical or which may be inimical to the public health, safety, or welfare or which is, or may be injurious to human, plant or animal life, or to property, or which unreasonably interferes with the comfortable enjoyment of life or property." After setting forth what it was that the Legislature desired to be controlled by the above-quoted definition, the Legislature thereafter in Sections 4 and 5 of the Act (35 P.S. 4004 and 4005) set forth the powers and procedures under which the Department of Health and the Air Pollution Commission would carry out the legislative intent, including the establishment of rules and regulations as set forth in 35 P.S. 4005(d)(2) and (7). This approach to governmental regulation is indeed the accepted and proper method for delegating authority to an administrative agency. One of the discretionary determinations to be made by the Commis-

sion is the scientific or technical rules and regulations which determine that amount of air pollution which should be prohibited in carrying out the legislative intent. If the regulatory agency sets forth unreasonable standards or fails to establish any standards of air pollution, the citizens are protected through the appeal provisions of the Act. Certainly the *possibility* of such an unreasonable determination should not be the basis for a holding that there has been an unlawful delegation of power. As stated before, we hold that there is not an unlawful delegation of powers in the Air Pollution Control Act.

2. *The enforcement of the rules and regulations of the Air Pollution Commission does not constitute a confiscation of property without due process of law in violation of the Constitution of Pennsylvania (Article I, Section 10), or the Constitution of the United States (Fourteenth Amendment).*

There is no doubt in this writer's mind after a review of the record in this case that operation of beehive coke ovens cannot practically or feasibly meet the minimum air pollution standards set in the rules and regulations of the Commission insofar as air pollution is concerned. Unless some unforeseen method for controlling the emission of particulate matter from these coke ovens is invented or developed, the beehive coke oven industry in this State will be forced out of business. In spite of the fact that this writer may believe that the disappearance of a large recognized industry in this State will be a socio-economic tragedy for thousands of citizens of this Commonwealth, this Court cannot pass upon the advisability of such an economic occurrence. That determination has been made by the Legislature, and this Court can do nothing but follow the mandates of that body.

Strangely enough, one of the cases cited by the appellant sets the stage for a discussion of this prob-

lem. In *White's Appeal*, 287 Pa. 259, 265, 134 A. 409, 411 (1926), Mr. Justice KEPHART says:

"The power of judicial investigation does not concern itself with the wisdom of the policy emanating from the legislative branch, or whether the best of all possible means of achieving the desired result has been selected. It is concerned only with the questions of whether the statute has a recognized police purpose, and whether it has a reasonable relation to the object to be attained.

Generally, the right concerns, as here, property and rights issuing out of it. No matter how seemingly complete our scheme of private ownership may be under our system of government, all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals of the people.

Obedience to such regulation is not taking property without due process; that clause does not qualify the police power: C. B. and Q. Ry. Company v. Drainage Commissioners, 200 U.S. 561; Salem v. Maynese, 123 Mass. 372; In re Cherry, 201 App. Div. N.Y. 856, 193 N.Y.S. 57, affirmed 234 N.Y. 607, 138 N.E. 465. Property is held under the implied obligation that the owner shall use it in such way as not to be injurious to the community: Windsor v. Whitney, 95 Conn. 357, 111 A. 354." Justice KEPHART, in this well reasoned opinion, goes on to state how firm the property rights of individuals are under our form of government, but throughout this opinion, he consistently states that one may use his property in any way he sees fit so long as that use harms no one.

The basic premise, then, is that coke oven operators in this State may use their property so long as they do no injury to other citizens of the Commonwealth in violation of the law. It matters not under the law that these coke ovens in question have been in continuous

use since 1898. There is no prescriptive right to cause injury to another, and this basic premise has existed every day of the operation of these coke ovens. They were always subject to that prohibition. In the Air Pollution Control Act, *supra,* the Legislature has established that certain air pollution is injurious to the public health, welfare and safety, and, now, it need only be determined whether or not those technical standards which were set by the Commission are reasonable, so as not to violate Bortz's constitutional rights.

Bortz nowhere in this case challenges the technical level of air pollution as established by the Commission as being violative of Bortz's rights. It has offered no testimony, evidence or argument that the standards set by the Commission were unreasonable except that those standards could not be met by Bortz in the operation of its coke ovens. Standards set by the Commission are applicable not only to Bortz, but to all citizens in the Commonwealth; and they are equally applicable to every coke oven operator in this State.

3. *Exclusion of governmental bodies from the penalties section of the Air Pollution Control Act, supra, does not constitute an unlawful discrimination and violation of the Pennsylvania Constitution (Article III, Section 32) or of the United States Constitution (Fourteenth Amendment).*

As we have already pointed out, Bortz carries a heavy burden of proof to establish the unconstitutionality of this statute. Bortz argues that it is discriminated against because of the elimination of governmental bodies from the penalty section of the Act (35 P.S. 4009). This argument has no merit, because the Legislature certainly had the power to determine that it would make no sense to penalize the government itself. This does not mean that a governmental body could not be ordered by a court to cease and desist emitting air pollution as determined by the Commis-

sion. Clearly, governmental bodies could be so restricted by a court; but to even attempt to hold some governmental body of this Commonwealth to a fine or imprisonment makes no sense. Contempt proceedings for the failure of a governmental body to abide by an order of court is adequate enforcement. Exclusions of Section 9 (35 P.S. 4009) are proper, and do not constitute an unlawful discrimination. See *Air Pollution Commission v. Coated Materials Company*, 92 Dauphin 274 (1970).

4. *The evidence presented by the Commission was not sufficient to establish a violation of the Air Pollution Control Act, supra, or the rules and regulations of the Commission.*

Under Section 5 (35 P.S. 4005) the Commission is given the power and duty to hold hearings as follows: "Hear and determine all appeals from orders issued by the department in accordance with the provisions of this act. Any and all action by the Commission taken with reference to any such appeal shall be in the form of an adjudication, and all such action shall be subject to the provisions of the Administrative Agency Law, the act of June 4, 1945, (P. L. 1388), as amended, insofar as the rights of any person aggrieved are concerned. Any party aggrieved as defined in the act of June 4, 1945 (P. L. 1388), as amended, known as the 'Administrative Agency Law', by any adjudication of the Commission shall have the right to appeal such adjudication in the manner provided by and subject to the 'Administrative Agency Law'."

The Administrative Agency Law (71 P.S. 1710.1 et seq.) provides the procedural due process guarantees under which the rights of citizens are protected.

In view of the fact that the Department of Health is the moving party seeking to abate the emission of particulate matter by Bortz, the Commonwealth had the burden of proving that acts of Bortz were in viola-

tion of the Air Pollution Control Act. In order to meet that burden, the Commission had to prove that under the statute and its rules, regulations and standards, Bortz had violated the law necessitating the abatement order.

We have already pointed out that the delegation of power to the Commission to establish rules and regulations in keeping with the legislative intent was proper. We now must determine whether or not the rules and regulations which establish the standards are enforceable. The abatement order refers to violations of Section 1.3 of the Air Pollution Commission Regulation IV, which reads as follows:

"Section 1.3 Limits for Particulate Matter Emissions

"In the absence of a determination by the Commission imposing more stringent or less stringent limits, as provided for in Section 1.4 of this regulation, a local air pollution problem shall be deemed to exist:

"(1) If any person causes, suffers, allows or permits smoke from any combustion unit, the shade or appearance of which is darker than No. 2 of the Ringelmann Smoke Chart, to be emitted into the outdoor atmosphere.

"Exception: Smoke emitted during the cleaning of a firebox or the building of a new fire may be darker than No. 2 of the Ringelmann Smoke Chart for a period or periods aggregating not more than 6 minutes in any 60 consecutive minutes.

"(2) If any person causes, suffers, allows or permits particulate matter (including smoke) to be emitted into the outdoor atmosphere from any air contamination source such that the actual or calculated emission rate of particulate matter from such source (as determined in accordance with Section 1.5) may be expected to cause a ground level concentration at any point outside the person's property in excess of either 150 micrograms of suspended particulate matter per cubic meter

of air or 0.6 milligrams of particle fall per square centimeter per month at any time.

"Whenever particulate matter from one air contamination source is discharged through two or more flues, the quantity that may be discharged from all of the flues shall not exceed the emission that would be permitted by assuming that all of the particulate matter is being emitted from a single flue having an effective height calculated in the following manner:

"Multiply the effective height of each flue by the percentage of the total air contaminant emission rate emitted through the flue, add the products and divide the sum by 100.

"Whenever particulate matter from more than one air contamination source is discharged through less flues than the number of air contamination sources, the quantity that may be discharged from each flue shall not exceed the emission permitted by this Section 1.3(2) for each flue except under unusual conditions (see Section 1.4).

"(3) If any person causes, suffers, allows or permits fugitive dust to be emitted into the outdoor atmosphere from any air contamination source or sources in such a manner that the ground level concentration of fugitive dust (as determined in accordance with Section 1.5) from the air contamination source or sources at any point outside the person's property exceeds a concentration of 2.0 milligrams per cubic meter of air above background concentration, for any 10 minute period.

"Whenever a local air pollution problem is deemed to exist, the Department may, in accordance with the procedures provided in the Air Pollution Control Act, issue an order directing the person or persons charged with causing, suffering, allowing or permitting such air pollution problem to control, abate or prevent such air pollution problem."

Besides the test of whether or not the restrictions stated in the standards of Section 1.3 are reasonable (which issue has not been raised by Bortz), we must determine if Section 1.3 gives a reasonable notice to the citizens of the Commonwealth of what is expected of them insofar as meeting the minimum standards is concerned. We hold that the above quoted regulations of Section 1.3 are reasonably understandable and adequately specific and therefore legally sufficient.

We next turn to the record in this case to determine whether or not the Commission presented sufficient evidence to support the regulatory action it desired to take. In this regard, we refer to the Administrative Agency Law, *supra* 71 P.S. 1710.44, which states: "The court to which the appeal is taken shall hear the appeal without a jury on the record certified by the agency. After hearing, the court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of sections 31 to 35 inclusive of this act have been violated in the proceeding before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set aside or modify it, in whole or in part, or may remand the proceeding to the agency for further disposition in accordance with the order of the court." The pertinent portion of this section is whether or not the finding of fact by the Commission is supported by "substantial evidence". "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and more is required than a mere scintilla of evidence or suspicion of the existence of a fact to be established. See *Pennsylvania State Board of Medical Education and Licensure v. Schireson*, 360 Pa. 129, 61 A. 2d 343 (1948); *Erie Resistor*

*Corporation v. Unemployment Compensation Board,* 194 Pa. Super. 278, 166 A. 2d 96 (1960).

In this case the Commonwealth presented the testimony of four witnesses. One was an official of the Commission who verified procedural records to the date of the hearing. Two witnesses were housewives who testified concerning dirt and soot in or about their homes caused by the coke ovens of Bortz. The fourth witness, who was the chief witness of the Commission, was an air pollution control engineer employed by the Department of Health in Region V where Bortz's coke ovens are situated. This engineering witness testified, in addition to his qualifications, to a visit to the scene of Bortz's coke ovens, to his taking photographs (which were not made part of the record) indicating smoke plumes and soot deposits and to his observations concerning the emission of smoke from the operation of Bortz's coke ovens. This witness described smoke blowing across the roadway towards some houses. He then testified that, based upon some literature, which was never identified, he was able to determine that 25 percent of the coal with which the beehive ovens are charged was lost in the form of smoke and particulate, and that based upon the tons of coke pulled from the ovens four days a week, he was able to estimate that each coke oven in Bortz's operation emitted more than 45 pounds of particulate matter per hour. From his *observations,* he testified that the smoke emissions were in excess of the permissible allowance of smoke as established by the Commission's regulation utilizing the Ringelmann Smoke Chart. He used none of the available instruments for testing smoke emissions or falling particulate matter.

The problem arises in that this witness, though admittedly an expert, for the purposes of this record, did not make any stack tests, nor did he utilize any of the available instrumentation to measure the amount of

falling particulate, emitting particulate, or smoke density.

If we are to permit employes of the Commission to determine that smoke and particulate matter emissions are in violation of the Commission's regulations based solely upon visual observations, then there is really no need to have standards and regulations at all. The standard is not what this witness or any single employe of a regulatory agency might deem to be a violation of what the Legislature intended. What is relevant is proof that the standards set forth by the regulatory agency have been met or violated in accordance with those specific standards. Visual tests and observations are not adequate evidence of a violation where recognized scientific tests are available. As was pointed out at the oral argument of this case, this Commonwealth in a Motor Vehicle Code violation case would not permit a qualified expert state policeman with 25 years' experience observing speeding automobiles on the Turnpike to testify to the speed of an automobile without the use of available instruments, such as radar and a tested speedometer. This Court cannot close its eyes to the necessity of a regulatory agency proving its case. Somehow, regulatory agencies such as the Air Pollution Commission and its employes, take the attitude that because they represent the government, there is no need for them to prove facts, except as established by the estimates and observations of their experts. Merely because the Commonwealth employs experts in the various fields of regulation does not necessarily mean that the Commonwealth need not prove its case. In the event it should occur in a case that there is no scientific measurement instrument, or no method for determining a violation, then, as in all adjudicated matters in this Commonwealth, violations will have to be determined upon the weight of the evidence produced.

However, where there are available established methods for determining violations, those methods must be used.

The Legislature certainly intended this approach to regulation. Why else would they provide for access to a citizen's property and specifically authorize tests as set forth in the Act at 35 P.S. 4004?

The Commonwealth here, in effect, is ordering the shutdown of Bortz's coke ovens. This is no small matter. To permit the Commission to order an abatement based solely upon the visual tests and observations of one employe strikes at the heart of fairness envisioned in every judicial process known to our system of jurisprudence.

If the engineering witness' testimony can be verified by established tests, then there is no doubt that the Commission can accomplish its purpose in this matter. We will remand this case back to the Commission for the purpose of having the Commission properly establish substantial evidence to prove the violation alleged in this case. If the Commission cannot establish that Bortz has violated the minimum standards set forth in Section 1.3 of its Regulation IV, through available tests, then it should establish other sufficient and credible evidence, or the abatement order must be dismissed. There is no way for this Court to determine from the present state of this record whether or not the particulate matter was in excess of 150 micrograms of suspended particulate matter per cubic meter of air, or in excess of 0.6 milligrams of particle fall per square centimeter per month.

This Court is not unfamiliar with the Ringelmann Smoke Chart, and therefore the Court is puzzled why such an inexpensive method of testing was not used in this case. In the case of *City of Portland v. Lloyd A. Fry Roofing Company*, 254 Ore. App.    , 472 P. 2d 826, 827 (1970), the court gave a description of a Ringelmann Chart as follows: "It is a plain white piece of

paper divided into four sections, numbered from one to four, and each about five and three quarters x seven and three quarters inches in size. On each of these sections is printed a series of intersecting heavy black lines of uniform width for each section, with the lines growing progressively wider from section one to section four, until on section four the black covers much more than half of the surface. This chart refers to Bureau of Mines Information Circular No. 6888, a copy of which is also in the record. From the chart and this circular, it appears that the chart is to be posted at a distance of 50 feet from the observer. When so posted the black lines and the white spaces merge into each other by a process of optical illusion, so as to present the appearance of a series of gray rectangles of different color densities, number 4 being the densest. Estimate of the density of smoke may be made by glancing from this chart so displayed to smoke, and picking out the section on the chart which most nearly resembles the smoke. This mode of measuring the density of smoke has been in use, it appears, for over fifty years. This affords a reasonably certain mode of determining and stating the density and opacity of smoke, and we think that the statute adopting it is not lacking in certainty." From this description, we are at a loss to understand why an engineer employed by this Commonwealth would not be equipped with a piece of paper such as described by the Oregon Court. A citizen whose business is about to be destroyed by an abatement order is certainly entitled to that much consideration (the use of the test instrument) in the establishment of his alleged violation.

5. *The refusal of the hearing examiner to permit testimony on the economic factors involved in this case was error.*

As is clearly shown in the order of the Air Pollution Commission from which this appeal arose, there

is power in the Commission to set time limits within which compliance with the Commission's orders may be set. It is conceivable that economic factors could very well persuade the Commission to set a deadline at some time different than it would otherwise set it without such information. In view of the fact that one of the declared policies of the Commonwealth, as noted above (35 P.S. 4002), is to protect the air resources of the Commonwealth to the degree necessary for the protection of the citizen's "well-being", "property" and the "expansion of industry", it is conceivable that economic factors could be very relevant to the Commission for it to properly carry out the legislative intent. This is not to say that the Commission must give weight to the economic factor evidence. We do say, however, that without such evidence, if it has been offered, the Commission cannot fully carry out the legislative intent.

## SUMMARY

As has already been pointed out, the Administrative Agency Law, *supra,* at Section 44, authorizes this Court within the scope of its jurisdiction to remand these proceedings back to the agency for further disposition in accordance with this opinion. We therefore

## ORDER

AND Now, this 9th day of July, 1971, it is hereby ordered that this matter be remanded to the Air Pollution Commission for the purpose of establishing substantial evidence of the alleged air pollution violation of appellant and to receive evidence in accordance with this opinion.

Judge MANDERINO concurs in result only.