### Butler Area Sewer Authority *v.* Northwest Sanitary Sewer System Authority.

77

Argued June 2, 1971, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Lee C. McCandless*, with him *Frank P. Krizner* and *McCandless, Chew & Krizner*, for appellant.

*Richard L. McCandless*, with him *Coulter, Gilchrist, Dillon & McCandless*, for appellee.

OPINION BY JUDGE ROGERS, August 27, 1971:

This is an appeal from an order of a court of common pleas granting the prayer of a petition of a municipal authority for judicial approval of the payment of money of the Authority to owners of properties as-

sessed for benefits conferred by the construction of a sewer by the Authority.

Here, as is often the case in public matters, although an air of urgent controversy pervades the proceedings, the material facts are not in dispute.

The City of Butler and the Township of Butler jointly owned and operated a sewage system. In about 1959, the township, desiring to serve additional areas, created two municipal authorities, the South Butler Township Authority and the Northwest Sanitary Sewer System Authority (Northwest), which latter authority only is involved in this suit. Northwest was unable to construct sewer lines because the treatment plant and trunk sewers owned by the city and the township lacked capacity to dispose of additional sewage. Thereupon, the city and the township created a joint authority named the Butler Area Sewer Authority (Butler Authority) to which they assigned all sewage facilities together with their right to receive a grant of Federal funds for enlargement of the treatment plant in an amount in excess of $1,200,000. Butler Authority with the money from the grant and by the sale of bonds then spent more than $3,000,000 enlarging its treatment plant and trunk lines to accommodate the sewage of Northwest and the South Butler Authority.

Northwest applied for and received approval of a Federal grant for a part of the costs of construction of the lines necessary to serve its area. The grant was, however, by regulation of both the State Department of Health and the Federal agency involved conditioned upon Northwest's having a satisfactory arrangement for the disposal of the sewage to be collected in its lines. This was accomplished by a written agreement between it and Butler Authority. By this, Butler Authority agreed to treat the sewage collected in Northwest's lines and to operate and maintain Northwest's system

at its, Butler Authority's, expense. It reserved the right to charge customers of the lines to be constructed by Northwest at a rate uniform throughout the Butler Authority system and the right to make and enforce rules, regulations and rates applicable throughout the system. Northwest agreed that Butler Authority should be the sole and exclusive agency for Northwest's sewage treatment service and the maintenance of its, Northwest's, properties; that Butler Authority would be entitled to any charges made for connections to Northwest's lines; that such charges would conform with Butler Authority's rules, regulations and rates; and that all construction and additions and extensions to Northwest's lines should be inspected and approved by Butler Authority. The final operative paragraph of the agreement, and the only reference therein as to its duration was as follows: "It is mutually agreed by and between the parties that this Agreement shall continue so long as the party of the second part [Northwest] shall have an outstanding indebtedness, or if the second[1] [sic] party should assume any unpaid balance, then in that event, without further action on the part of either party all sewer lines, trunk lines, equipment and right of ways, or realty, to. wit, all assets of the second party become and remain the property of the first party." Northwest constructed its sewers at a total cost of about $723,000. Of this $342,000 was supplied by the Federal grant. The balance was initially raised by a bank loan of $365,000, to obtain which the agreement between Northwest and Butler Authority was submitted as evidence of the feasibility of the project. This loan was intended to and was repaid with money received from assessments totaling $370,000 imposed upon ap-

---

[1] The parties agree that the reference to second party at this place was an inadvertence and that first party, the Butler Authority, was meant.

proximately 658[2] properties benefited by the sewers. The amount of each assessment was based on use units, the basic unit, apparently for a dwelling house, being $495.30. The range of assessments was from the minimum standard of $495.30 to a high of $13,868 for a garment factory. The vast majority were in the amount of $495.30. In addition, a tapping fee of $52 was charged each of the original customers.

The Northwest system was completed and connected with the Butler Authority system in 1965. Since that time the Butler Authority, at its sole expense, has operated and maintained the Northwest system as well as its own. Specifically its employes have inspected and approved extensions of and connections with the Northwest lines.

Northwest adopted resolutions and Butler Township enacted ordinances, both with the knowledge of Butler Authority, establishing fees to be paid by customers desiring to connect after construction of the system. These were $450 for connecting to a main line. and $150 for connecting to a service line, in addition in each instance to a tapping fee of $52. The amounts of these charges were fixed so as to provide an equitable sharing of the burden of construction costs not paid by the Federal grant between the owners of properties originally assessed and the persons subsequently connecting. The cross-examination of the chairman of the board of Northwest explains, as explicitly as can be done, what here occurred: "Q. . . . Suppose we take this rectangle and say that a man owned that at the time the sewer was built and the sewer ran right along the property on a street. He would be assessed four hun-

---

[2] This number is given as approximate because it is obtained by counting from an untotaled exhibit. Although this approximate number of properties were assessed, apparently about 559 connections were made by the approximately 544 owners.

dred and ninety-five dollars and thirty cents and be charged a tap-in fee of fifty-two dollars? A. That is right sir. Q. So his total charge was five hundred forty-seven dollars and thirty cents? A. Right, sir. Q. Now, we take that man and he divides the frontage and he makes another lot and somebody builds there. You would collect four hundred and fifty dollars plus fifty-two dollars or a total of five hundred and two dollars? A. That's possible. Q. Well, it's because the line is right in front of it and he connects directly onto the line, isn't that the way it works? A. Yes, sir. Q. Yes, it is. Now then, he takes the rear end of his lot and he divides it two ways, but you don't have to come through his other property so, he builds the sewer? A. That is right. Q. From the mainline he lays it to take care of the two back end lots. So, because they went to the expense of building the sewer the assessment is one hundred and fifty dollars plus fifty-two dollars? A. Right sir. Q. Or the total assessment is two hundred and two dollars? A. That is right, sir." By reason of these charges, Northwest had accumulated the sum of about $73,000 at the time of the hearings in this matter held in May and June of 1970. It is this fund which is the subject of this lawsuit.

Most of the original assessments for benefits were paid promptly and the bank loan was repaid in full in 1967. At the time of the hearings seven assessments remained unpaid. The only other item of business for Northwest was disposition of one claim for damages for the taking of a right-of-way then pending in the common pleas court on appeal from a jury of view award of $1,300 in favor of the landowner. At the hearings, Northwest officers agreed that $10,000 would be more than enough to meet all obligations of the Authority.

The Board of Northwest decided that the $73,000, less the reserve of $10,000, should be paid to the 544

persons whose properties had been originally assessed. By calculation, this proposed payment amounted to $80 per use unit assessed for $495.30. Its reasons for this beneficence to this group of customers were: first, that the prompt payment by these persons of their assessment enabled the Authority to repay the bank loan promptly;[3] second, that many of these persons had granted rights-of-way without consideration;[4] and third, that members of the Board of the Authority had promised these people that if money could be saved on the project such savings would be refunded. No explanation is offered as to why persons who subsequently connected to the line at substantial cost, or who subsequently gave rights-of-way, or who had purchased properties originally assessed, or who as taxpayers of the United States provided half of the cost of the project, were not considered deserving of the Authority's largesse.

Northwest petitioned the court of common pleas for and obtained a rule on *all persons in Butler Township and on the Board of Commissioners of Butler Township* to show cause why it should not pay "to the persons who had paid for the original trunk lines the sum of $65[5] for each $495.30 payment and to credit the account of those nine units not yet paid with a said sum." The court ordered that service on "the citizens of Butler Township" might be made by publication. Although not named as a respondent, Butler Authority appeared and filed an answer contending that the money be-

---

[3] The Board proposed, however, to credit the accounts of persons who had not paid their assessments.

[4] Obviously not all had. Northwest's officers assigned as a cause for the five year delay in winding up the affairs of the Authority, the necessity of disposing of such claims. The one such claim remaining in litigation is that of George and Rose Kulick, who are proposed as recipients of $80.

[5] By amendment this amount was later increased to $80.

longed to it by virtue of the service agreement. Butler Authority also filed a petition for declaratory judgment seeking a determination as to who was entitled to the fund but this was dismissed by the court below. The hearings in this matter were, therefore, on Northwest's petition and rule on the residents or citizens of Butler Township and the township commissioners, with Butler Authority participating as though a respondent.

On this appeal, as it did below, Butler Authority raises the question of the propriety of the procedure here followed. A rule is not properly original process and this rule should not have been granted. *Commonwealth v. Dauphin County*, 354 Pa. 556, 47 A. 2d 807 (1946); *Cooney v. Pennsylvania Osteopathic Association*, 434 Pa. 358, 253 A. 2d 256 (1969); *Short, Appellant, v. Board of the School District of Upper Moreland Township*, 108 Pa. Sup. 503, 165 A. 669 (1933). Proceedings by rule may be had only where authorized by statute, *Short v. Board of the School District of Upper Moreland, supra;* or as auxiliary for the facilitation of jurisdiction already had, *Automobile Banking Corporation v. Weicht*, 160 Pa. Sup. 422, 51 A. 2d 409 (1947); or as a means of correcting a court's own records, *Delco Ice Manufacturing Company v. Frick Company, Inc.*, 318 Pa. 337, 178 A. 135 (1935). The court below dismissed Butler Authority's petition for declaratory judgment because it believed there were important controverted or disputed facts and because it believed the petitioner was asking a merely advisory opinion. A reading of Northwest's petition for rule and Butler Authority's petition for declaratory judgment, and for that matter, Butler Authority's answer to Northwest's petition, reveals no dispute whatsoever as to factual matters; and, of course, Northwest's petition for rule sought nothing other than the court's imprimatur of its decision to pay the funds to its first customers.

Butler Authority's petition for declaratory judgment was, however, subject to attack on the ground that there was available an action of assumpsit on the service agreement. *McWilliams v. McCabe*, 406 Pa. 644, 179 A. 2d 222 (1962); *State Farm Mutual Automobile Company v. Semple*, 407 Pa. 572, 180 A. 2d 925 (1962). However, while assumpsit might resolve the issue of the ownership of the $73,000, it could not touch the matter of other assets of Northwest including interest in real estate and possible tangible personal property. Butler Authority in its petition for declaratory judgment asked the court to determine the issue of whether Northwest, having completed the project for which it was created, should not be legally terminated and its assets distributed. It is therefore clear that a determination of the issue of ownership of this money would not settle the entire matter here in controversy. In such a case, a petition for declaratory judgment is properly entertained although another remedy exists adequate to determine one issue. *McCandless Township v. Wylie*, 375 Pa. 378, 100 A. 2d 590 (1953); *Lakeland Joint School District v. Scott Township School District*, 414 Pa. 451, 200 A. 2d 748 (1964). In summary, the court below should have dismissed Northwest's petition for rule as legally unwarranted and it should have entertained Butler Authority's petition for declaratory judgment. As we have noted, there is no dispute as to material facts. The two days consumed in hearings were unnecessary except as they have provided the facts, the establishment of which by stipulation was apparently not possible. So much effort having been expended in this litigation and the matter being of such importance to the public of Butler City and Township, we will, without condoning the inappropriate procedure, entertain this appeal, considering and treating it as a proceeding for a declaratory judgment. *Garrett v. Mc-*

*Henry*, 403 Pa. 451, 170 A. 2d 363 (1961); *Cooney v. Pennsylvania Osteopathic Assn.*, 434 Pa. 358, 253 A. 2d 256 (1969); *see Miller v. Cambria County*, 25 Pa. Sup. 591 (1904); *Cooke v. Borough of Greenville et al.*, decided June 7, 1971, 2 Pa. Commonwealth Ct. 447, A. 2d (1971).

Passing to the merits, Northwest contends that its proposal to refund money to persons assessed for benefits for the original construction of the lines is authorized by Section 4B(t) of the Municipality Authorities Act of 1945, May 2, P. L. 382, 53 P.S. 306B(t). There was no Section 4B(t) when the Act was first enacted. By amendment of 1947, June 12, P. L. 571, the following was added to Section 4B empowering authorities: "(t) To charge a tapping fee whenever the owner of any property connects such property with a sewer system constructed by the Authority, which fee shall be in addition to any charges assessed and collected against such property in the construction of such sewer by the Authority or any rental charges assessed by the Authority." By amendment made in 1957, May 31, P. L. 211 the words "or water mains" were added to clause (t). Finally in 1963, May 15, P. L. 33 the following provision was added: "Whenever a sewer system or water main or any part or extension thereof owned by an Authority has been constructed by the Authority at the expense of a private person or corporation or has been constructed by a private person or corporation under the supervision of the Authority at the expense of the private person or corporation, the Authority shall have the right to charge a tapping fee and refund said tapping fee or any part thereof to the person or corporation who has paid for the construction of said sewer system or water main or any part or extension thereof to the person or corporation paying for construction thereof." Our conclusion that

the 1963 amendment provides no power to do what Northwest here proposes requires no extended discussion. The purpose of the amendment was to give explicit sanction to those salutary agreements between private persons who, needing sewer or water for their own purposes, undertake to install mains or extensions of existing mains at their sole expense in a fashion and in locations so as to make service available to others, in consideration of refunds in the event others do indeed connect. It was not intended to authorize refunds to such persons previously assessed for benefits as the Board of the Authority may consider deserving.

There remains the determination of the proper disposition of these funds. The history of these proceedings and a careful examination of the documents of record plainly show that they are or should be the property of Butler Authority. Northwest was created for the sole purpose of constructing the lines within a portion of a sewage service area to be served by Butler Authority. This is expressed in the service agreement between Northwest and Butler Authority. It is confirmed by the fact that Northwest has had nothing whatsoever to do with the operation, maintenance, extension or supervision of the lines it constructed since their connection with the Butler Authority system all of which have been performed by Butler Authority at its expense.

The Service Agreement provides that upon the discharge of Northwest's outstanding indebtedness or its assumption by Butler Authority "then, in that event, without further action on the part of either party all sewer lines, trunk lines, equipment and right-of-ways, or realty, to wit, all assets" of Northwest should become and remain the property of Butler Authority. Much testimony was received as to what was intended to be included among the assets of Northwest to become

the property of Butler Authority. Such testimony should have been excluded under the parol evidence rule. The language of the agreement is not ambiguous in this regard; all assets pass to Butler Authority, including the fund here in question.

There is nothing, however, in this record to show that Butler Authority has assumed or agreed to assume Northwest's obligations, estimated at a maximum of $10,000. If it has or does assume such, it became or becomes thereby the owner of Northwest's property.

Although the agreement between the parties is in terms self executing, transfers of properties, including rights-of-way, may require action of the parties, which in turn may require further determinations, orders, decrees or other exercise of the court's powers.

The order of the court below is reversed and the record remanded to the court below for further proceedings not inconsistent with this opinion.

Judge MANDERINO dissents.

———

CONCURRING AND DISSENTING OPINION BY JUDGE MENCER:

I am in complete accord and concur with the majority that the court below should have dismissed the petition of the Northwest Sanitary Sewer System as legally unwarranted. However, I must dissent to the majority's determination that the $73,000.00 in question belongs to the Butler Area Sewer Authority. This determination in my view is *obiter dicta* and I do not comprehend how we can pass upon matters which have not been appealed to this court. The Butler Area Sewer Authority failed to take an appeal from the lower court's dismissal of its petition for a declaratory judgment. In the absence of an appeal I do not believe we can decide the disposition of the fund that has been accumulated by the Northwest Sanitary Sewer

System Authority. We should not decide questions which are not properly before us. *Exner v. Gangewere,* 397 Pa. 58, 152 A. 2d 458 (1959); *Harr, Secretary of Banking v. Fairmount Foundry, Inc.,* 331 Pa. 59, 200 A. 46 (1938); *Hesselman v. Somerset Community Hospital,* 203 Pa. Superior Ct. 313, 201 A. 2d 302 (1964).