554 A.2d 596

Willard Agri-Service, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Agriculture, Respondent.

Argued September 15, 1988, before Judges COLINS and MCGINLEY, and Senior Judge KALISH, sitting as a panel of three.

*Katherene E. Holtzinger-Conner*, with her, *Frank B. Boyle, Law Offices of Frank B. Boyle*, for petitioner.

*Stephen R. Pelcher*, for respondent.

OPINION BY JUDGE MCGINLEY, February 16, 1989:

Willard Agri-Service, Inc. (Willard) appeals an order of the Secretary of Agriculture (Secretary), dated January 21, 1988, assessing a fertilizer deficiency penalty pursuant to the "Pennsylvania Fertilizer, Soil Conditioner and Plant Growth Substance Law" (Law)[1] in the amount of $5,016.00. We affirm.

On July 28, 1986, the Department of Agriculture (Department) determined that a fertilizer manufactured by Willard was deficient in its guaranteed nutrient components.[2] The Department issued a penalty letter from

---

[1] Act of May 29, 1956, P.L. 1795, *as amended*, 3 P.S. §§68.1—68.23.

[2] Willard was assessed a penalty pursuant to Section 7(a)(2) of the Law, 3 P.S. §68.7(a)(2), which states:

(2) A fertilizer shall be deficient if the determined analysis of the combined primary nutrients is such that the relative commercial value computed using the sched-

which Willard appealed. De novo hearings were held on July 10, 1987, and August 26, 1987, before a hearing examiner who filed a proposed adjudication and order on December 21, 1987. On January 19, 1988, Willard filed exceptions but on January 21, 1988, the Secretary adopted the proposed adjudication and order. Willard appeals now to this Court.

The relevant findings of fact are as follows:

1. Willard Agri-Services, Inc. (hereafter 'Willard'), built, operates and maintains a modern computer assisted fertilizer manufacturing plant in Marion, Pennsylvania.

2. In 1986, Willard manufactured a 'clear' liquid fertilizer solution known as 7-21-6. These numbers represent the guaranteed presence of the plant nutrients nitrogen, phosphoric acid and potash. The 'clear' solution refers to the liquid fertilizer not requiring agitation before it is used.

3. Willard sold the 7-21-6 fertilizer to Agway, Inc. (hereafter 'Agway') in Carlisle, Pennsylvania and on six different occasions between April 10, 1986 and May 6, 1986, the fertilizer was shipped by Agway through Shillito, Inc., a common carrier, hired by Agway.

4. When Agway received the shipments, the liquid fertilizer was placed in a storage area of four holding tanks. The tanks are known as A, B, C and D. The tanks are connected by various hoses and each tank has an external valve at its base. Just

---

the relative commercial value similarly computed from the guarantee. When a fertilizer is subject to a penalty under both this clause and clause (1), the larger penalty payment shall apply. Any such penalties assessed shall not exceed the price paid by the purchaser.

beyond the valve is a quick coupler where a separate hose leads to a common pump and meter so the contents of the tanks can be dispensed to customers.

5. On May 7, 1986, Roger Dressler, an inspector with the Department of Agriculture (hereafter the 'Department') travelled to the Agway store for a routine inspection and to obtain test samples of products at the Agway store.

6. On May 7, 1986, Mr. Dressler took a sample from tank A, which tank had been filled on May 6, 1986 with the liquid fertilizer manufactured by Willard, having a guaranteed analysis of 7-21-6.

7. The sample was taken by Mr. Dressler after Joseph Kann, an employee with Agway, disconnected the hose located at the quick coupler to tank A. The quick coupler is located just beyond the valve to tank A. Appropriately one to two gallons were drained through the line, to accomplish a flushing of the line, before Mr. Dressler obtained two four ounce samples.

8. The samples remained in Mr. Dressler's car for five days until turned into the Department's lab for testing.

9. The Department's lab test of the sample was [sic] taken May 7, 1986 found the components of the Willard liquid fertilizer to be as follows:

| | |
|---|---|
| Nitrogen | 6.4 |
| Phosphoric Acid | 13.2 |
| Potash | 5.1 |

10. The Pennsylvania Fertilizer, Soil Conditioner and Plant Growth Substance Law, 3 P.S. §68.1, et seq., (hereafter the 'Fertilizer Law'), permits a

deviation of the guaranteed analysis of ten percent for the primary nutrients nitrogen, phosphoric acid and potash.

11. Based upon the lab test, the Department issued a deficiency notice to Willard. The notice calculated a penalty in accordance with the Fertilizer Law. The notice was subsequently amended on several occasions with the penalty amount stated in the notice presented at the hearing being $6,336.00. At oral argument, the parties indicated to this Hearing Examiner, the penalty, by stipulation, should not be greater than $5,016.00.

12. In July, 1986, following receipt by Willard of the deficiency notice, representatives of Willard travelled to Agway and took two samples of the liquid fertilizer in 'tank A. One sample was taken after flushing the external line in a manner similar to the procedure followed by Mr. Dressler, although at least three gallons were allowed to flow through the line before the test sample was taken. This sample was tested by Willard's lab and found to contain the following components:

| Nitrogen | 6.87 |
| Phosphoric Acid | 18.43 |
| Potash | 6.03 |

The second sample was taken from the top of the tank, after fifteen minutes of agitation and resulted in a finding of:

| Nitrogen | 6.95% |
| Phosphoric Acid | 18.51% |
| Potash | 6.06% |

13. The variations in the two test results by Willard are statistically insignificant but do indicate

that only the second ingredient, phosphoric acid, was below the guaranteed minimum statutory allowance.

14. In July, 1986, at the time Willard representatives took their samples from tank A in cooperation with a representative of Agway, a six to eight inch sludge was observed at the bottom of the tank. The sludge was of unknown origin, but was believed to have been present for possibly two years and the residue of prior liquid fertilizer solutions, the most recent of which was 7-21-7. The sludge was below the outlet to the external valve at the base of the tank. Upon analysis by Willard, the sludge was shown to contain nutrients identified as 7.7-23.66-4.83.

15. A subsequent sample was obtained by the Department on August 1, 1986. The sample was similarly tested and found to contain an analysis of the primary nutrients as follows:

| | |
|---|---|
| Nitrogen | 6.7 |
| Phosphoric Acid | 17.7 |
| Potash | 5.8 |

This test was disregarded by the Department because on June 12, 1986, tank B was emptied into tank A so that the validity of the original test sample had been compromised.

16. The primary holding tank for the 7-21-6 shipments from Willard was tank A, with tank B available for overflow, until June 12, 1986 when tank B was emptied into tank A and a different product entered into tank B. Tanks C and D were at all times relevant hereto, used to hold rinsewater or an unrelated nitrogen fertilizer product.

17. There is a possibility that some seepage between the tanks occurred though [sic] faulty valves, human error, or backflow from the common pump manifold.

18. Agway, which had not been satisfied with its prior source of liquid fertilizer, was very pleased with customer reports following the use of the Willard product.

19. The capacity of the line extending from [the] base of tank A to the valve and to the quick coupler was not established with accuracy, although the distance was estimated to be between one and two feet.

20. From April 10, 1986 to June 26, 1986, Agway purchased 306,000 pounds of 7-21-6 fertilizer from Willard. Agway records, as summarized by the Department, show it sold 306,410 pounds of this fertilizer to consumers.

(Proposed Findings of Fact, Opinion and Order of the Secretary, January 21, 1988, at 1-6.)

Willard makes several arguments: that the Department had the burden to demonstrate where the fertilizer deficiency occurred; that the Secretary's findings of fact are not supported by substantial evidence in several respects; that the Secretary erred in denying Willard's petition for costs; and finally, that the Secretary erred in failing to adopt Willard's proposed findings and conclusions.

The Department argues that the Secretary's findings are supported by substantial evidence; and also, that the brief which Willard filed with this Court is not in conformance with the Pennsylvania Rules of Appellate Procedure and therefore Willard's appeal must be dismissed.[3]

---

[3] The Department argues Willard's appeal should be dismissed because it is not in substantial conformance with Pa. R.A.P. §§2116(a)

Initially we note that our scope of review is limited to determining whether Claimant's constitutional rights have been violated, whether an error of law has been committed or whether the findings of fact are not supported by substantial evidence in the record. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704, *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

Willard first argues that the Secretary erred by failing to require the Department to establish where the fertilizer deficiency actually occurred. We disagree. It is the responsibility of the Department to establish by substantial evidence that the fertilizer manufactured by Willard was deficient in its guaranteed nutrient components. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *S.H. Goss Inc. v. Department of Agriculture,* 58 Pa. Commonwealth Ct. 516, 525, 428 A.2d 731, 735 (1981)[4] citing *Bortz Coal Co. v. Commonwealth,* 2 Pa. Commonwealth Ct. 441, 456, 279 A.2d 388, 397 (1971).

---

and 2117. After review of Willard's "Statement of Questions Presented" and "Statement of the Case," we agree that Willard's brief is not in compliance, but we find that it does not warrant a dismissal of Willard's appeal under *Commonwealth v. Drew,* 353 Pa. Superior Ct. 632, 510 A.2d 1244 (1986).

[4] In *Goss,* the appellant, a fertilizer manufacturer, challenged the sampling methods used by the Department to sample bagged fertilizer. The sampling methods that the Department used were in accordance with 7 Pa. Code §73.8(e), those adopted by the Association of Official Analytical Chemists (AOAC). Appellant presented substantial expert testimony that the AOAC sampling technique would not produce a representative sample and that a different technique would produce a more reliable sample. The *Goss* Court concluded that while the method proposed by appellant "would likely increase the probability of obtaining a truer representation of the fertilizer lot we cannot agree that the method now used is either unreasonable or invalid." *Goss* at 523, 428 A.2d at 734-5.

Section 6(a) of the Law, 3 P.S. §68.6(a), states:

> (a) It shall be the duty of the secretary to sample, inspect, make analysis of, and test fertilizers, soil conditioners or plant growth substances distributed within this Commonwealth at reasonable times and places and to such an extent as he may deem necessary to determine whether such fertilizers, soil conditioners or plant growth substances are in compliance with the provisions of this act. The secretary may enter upon any public or private premises during regular business hours in order to have access to fertilizers, soil conditioners or plant growth substances subject to the provisions of this act and the rules and regulations pertaining thereto.

The Court in *Goss* permitted test samples of fertilizer to be obtained away from the point of manufacture and held that there is no "constitutional infirmity in the Department's failure to notify the manufacturer as to when and where each inspection is to occur. Since consumers may request that fertilizer which they have purchased be inspected, the inspections often occur at locations distant from the place of manufacture."[5] *Goss* at 520, 428 A.2d at 733. The record reveals that the Department adequately presented a prima facie case.

Willard's second argument is that the Secretary's findings of fact are not supported by substantial evidence in several respects.[6]

---

[5] The *Goss* Court also noted that the manufacturer is further protected by Section 6(d) of the Law, 3 P.S. §68.6(d) which states: "Upon request, the secretary shall furnish to the guarantor a portion of any sample found subject to penalty or other legal action. Such requests must be made within thirty days of notification of sample violations."

[6] First, Willard argues that the sample was not obtained in accordance with applicable regulations; second, that the Secretary

With respect to the adequacy of the sampling technique used we note that the Secretary found that the Department followed the procedures required by Department regulations.[7] Section 2.002(a) of the AOAC's regulations (Willard's Exhibit E at 385a of the Reproduced Record (RR)) provides the procedure for testing clear solutions as follows:

> (a) Clear Solutions. (Mixed Liquids and Nitrogen solutions.) Secure sample directly from mixing vats, storage tank, or delivery tank after thoro [sic] mixing. Take sample from surface or thru direct tap. Flush direct tap, or delivery line and faucets and collect sample in glass or polyethylene container. Alternatively, lower sample container into well mixed material thru port in top of tank and let fill. Seal container tightly.

*Methods of Analysis*, Association of Official Analytical Chemists, 14th Edition, §2.002(a).

---

erroneously determined that the integrity of the May 7, 1986, sample was not challenged or compromised by intervening factors; third, that the Secretary erroneously proceeded on the factual finding that the May 7, 1986, sample was taken from a May 6, 1986, shipment; and, fourth, that the Secretary erroneously failed to find that Willard's records established that the product was not deficient when it was manufactured. Willard's third and fourth contentions are without merit. The Secretary did not find that the May 7, 1986, sample was taken from a May 6, 1986, shipment. (*See* Findings of Fact Nos. 3, 6, and 16.) The secretary recognized that the sample could have been the combination of any of the shipments between April 10, 1986, and May 6, 1986. Additionally, Willard's argument that the Secretary disregarded the fact that a variance did not exist between the shipping tickets and the inventory is equally without merit. Questions of resolving conflicts in the evidence and evidentiary weight are properly within the discretion of the Secretary.

[7] Department regulations provide that procedures adopted by the AOAC for obtaining samples, sample preparation and analysis shall be used. 7 Pa. Code §73.8(c) and (d).

Roger Dressler (Dressler), an agricultural products inspector with the Department, testified that on May 7, 1986, he made a routine visit to the Agway store in Carlisle, Pennsylvania and took two samples from tank A (Department's Exhibit D at RR 352a). The samples were obtained at the base of the tank at the outlet valve and not from the top of the tank. (The valve in question was circled in red by Dressler during his testimony. *See* Willard's Exhibit C, Document No. 17 of the Certified Record (CR).) Dressler testified that the amount of product allowed to flow out exceeded the capacity of the valve in question;[8] the line was flushed by permitting a minimum of one gallon of the contents to run out of the tank in the presence of George Kann (Kann), farm coordinator at the Agway store (Notes of Testimony, June 29, 1987, (N.T.) at 26-28). Kann testified that he watched the flushing (N.T. at 33) and that a gallon or even two gallons were discharged before the sample was taken (N.T. at 40). There is substantial evidence to support the finding that one or two gallons were drained through the line and that the line was sufficiently flushed so that Dressler obtained the sample directly from the storage tank in compliance with the AOAC standards of Section 2.002(a).[9]

---

[8] The purpose of allowing a quantity of product to flow out is to assure that a sample is a fair representation of what is contained in the tank (Willard's Exhibit E at RR 385a).

[9] Willard also argues that the AOAC standards require "thoro [sic] mixing." The Department contends the mixing requirement applies only to the time of manufacture and that it does not apply to clear solution in the market place ready for consumer purchase or use. Willard also challenges the vagueness of the AOAC standards and suggests the Association of American Plant Food Control Officials (AAPFCO) Inspectors Manual (Willard's Exhibit E at RR 370a) should have been used. We reject both of these arguments based upon this Court's holding in *Goss* and the fact that review of the AOAC requirements indicate that "thoro [sic] mixing" and agitation of a clear solution at the time of testing in the market place is not required.

Willard also argues that the Secretary's findings of fact are faulty because the Department erroneously determined that the integrity of the May 7, 1986, sample was not challenged or compromised by intervening factors. However, review of the testimony indicates that the Department's determination was not erroneous. Willard makes three allegations. First, a common carrier contracted by Agway transported the liquid in a tank truck, which in turn loaded it into one of two storage tanks on Agway's property (these tanks are connected to two other tanks through connecting hoses and pumps). Willard argues operator error or back washing could have contaminated its product. Second, Willard questions the integrity of the test sample because Agway sold more of the fertilizer than was shipped, and it is impossible to pinpoint when the discrepancy occurred or even to imply its affect on the fertilizer at the time of testing. Finally, Willard argues that the presence of an unknown sludge at the base of tank A casts doubt upon the integrity of the sample.

The written statement of the President of Shillito, Inc., the common carrier engaged by Agway to transfer the fertilizer from the plant to the Agway store, was entered into evidence pursuant to a stipulation by the parties (Department's Exhibit A at RR 348a). According to Esther Warehime, "all tank trailers used were empty before loading at Willard, and are used solely for transporting fertilizer. All shipments went directly from Marion, Pennsylvania to their intended destination without delay. All drivers involved in the transporting of these fertilizer shipments are longtime and trustworthy employees of Shillito Oil, Inc." (RR 348a) This statement was the only evidence regarding the common carrier and no evidence was presented to indicate any contamination to the fertilizer during shipment.

There was also no evidence that Agway caused any contamination to affect the sample's analysis. Kann testified that on May 7, 1986, tank A contained only a fertilizer manufactured by Willard with a guaranteed analysis of 7-21-6 (N.T. at 31-32). Kann further testified that he was certain that tank A contained only this product since "[o]n or about the beginning of April the tank was emptied and prior to being filled with 7-21-6 from Willard there was nothing in the tank." (N.T. at 32) Willard notes that Agway indicates more product was sold than it received. The Secretary noted that "it is impossible to say why or when the discrepancy occurred or even to imply its affect [sic] on the fertilizer at the time of hearing." (Opinion and Order of the Secretary at 11) Questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of the factfinding agency, and are not usually matters for a reviewing court. *Pennsylvania Game Commission v. Department of Environmental Resources,* 97 Pa. Commonwealth Ct. 78, 82, 509 A.2d 877, 880 (1986) quoting *Chapman v. Pennsylvania Board of Probation and Parole,* 86 Pa. Commonwealth Ct. 49, 55, 484 A.2d 413, 416 (1984).

Willard's final argument regarding the integrity of the 7-21-6 fertilizer is that it had been compromised at the time Dressler took his sample by the presence of sludge at the bottom of tank A. The Secretary concluded that it "is also impossible to conclude that the sludge on the bottom of tank A affected the test results." We agree. Larry Martin, Willard's general manager of the Marion facility, testified that he obtained a sample of the sludge for testing, and indicated a fertilizer nutrient analysis of 7.7-23.66-4.83 (Willard's Exhibit O at RR 391a). Willard presented no testimony in support of its argument that the sludge affected the integrity of the fertilizer in tank

A. The Department's agricultural products supervisor at the time the sample was taken, Earl M. Haas (Haas), testified that if the sludge was not soluble (its presence indicates a low degree of solubility), it would not have affected the 7-21-6 fertilizer. If it was soluble, Haas testified, it would only contribute to the nutrient content of the 7-21-6 fertilizer (N.T. at 102-103).

Commenting on the possible discrepancy between the amount of product Agway reported sold and the amount of product delivered and the sludge, the Secretary noted that "[h]ad there been a showing of material affect, [sic] the outcome of this case might well have been different." (Opinion and Order of the Secretary at 12) The Secretary alertly perceived that there was no evidence of record to establish that either circumstance would have caused the nutrient deficiency.

Finally, Willard argues that the Secretary erroneously denied Willard's petition for costs resulting from the Department's cancellation of a June 11, 1987, hearing. Willard cites 71 Pa. C.S.A. §2301 throughout its brief. We assume Willard meant to refer to Section 3 of the Act of December 13, 1982, (Act), P.L. 1127, *as amended*, 71 P.S. §2033, which provides in pertinent part:[10]

> (a) Except as otherwise provided or prohibited by law, a Commonwealth agency that initiates an

---

[10] We wish to emphasize to the parties that the proper procedure for appealing a denial of reimbursement of attorney fees under the Act was not utilized in this case. Subsection 3(e) provides that a party dissatisfied by an agency determination under the Act may file a "petition for leave to appeal," 71 P.S. §2033(e). This Court may then grant or deny such a petition. No such procedure was utilized in this case. However, as this case has been briefed and submitted for decision, we will treat the petition for review as a petition for leave to appeal and allow the appeal. In the future, failure to follow the proper procedures under the Act may result in the dismissal of the appeal.

adversary adjudication shall award to a prevailing party, other than the Commonwealth, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer finds that the position of the agency, as a party to the proceeding, was substantially justified or that special circumstances made an award unjust.

(b) A party seeking an award of fees and expenses shall submit an application for such award to the adjudicative officer and a copy to the Commonwealth agency within 80 days after the final disposition of the adversary adjudication. The application shall include:

(1) A showing that the applicant is a prevailing party and is eligible to receive an award under this section.

. . .

(3) An allegation that the position of the Commonwealth agency was not substantially justified.

Willard complains that it expended money for an expert witness who travelled from Alabama for a hearing that was cancelled and that there were additional costs. The Department cancelled the hearing because the scheduled court reporter could not attend. Willard offered to obtain and pay for another court reporter that same day, but the Department rejected the offer. However, in spite of Willard's good faith, Section 3 (b) (1) of the Act requires the applicant to be a prevailing party. The Secretary concluded:

> While the position of the Department may arguably be/not substantially justified since Willard's offer could certainly have expedited the hearing and permitted the witness to testify on that day, the Hearing Examiner appears pre-

cluded from awarding such fees and expenses under 4 Pa. Code §2.6 which requires an eligible party to be a prevailing party. For this reason, the application is denied.

(Opinion and Order of the Secretary at 14.) The Secretary has not erred.

Accordingly, we affirm the Secretary's decision.

ORDER

AND NOW, February 16, 1989, the order and opinion of the Secretary of the Department of Agriculture dated January 21, 1988, at Case No. 1987-1, is hereby affirmed.

Judge MACPHAIL did not participate in the decision in this case.