United States Steel Corporation *v.* Department of Environmental Resources.

430

Argued December 5, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*David McNeil Olds*, with him *Harley N. Trice, II,* and *Reed, Smith, Shaw & McClay*, for appellant.

*Barbara Brandon*, Assistant Attorney General, with her *Louis A. Salaman*, Special Assistant Attorney General, and *Richard S. Ehman*, Special Assistant Attorney General, for appellee.

OPINION BY JUDGE KRAMER, February 6, 1973:

This is an appeal from an Order dated May 31, 1972 (as amended on June 1, 1972), issued by the Environmental Hearing Board (Board) assessing a "civil penalty" in the amount of $5,000 against the United States Steel Corporation (USS), the Board having concluded that USS had discharged from one of its facilities oils constituting industrial waste in violation of Sections 307 and 401 of The Clean Streams Law, Act of June 22, 1937, P. L. 1987, as amended, 35 P.S.

§§691.307 and 691.401. On a date not ascertainable from the record in this case, the Bureau of Sanitary Engineering of the Department of Environmental Resources (DER) filed a complaint with DER praying for the assessment of a civil penalty against USS under the provisions of Section 605 of The Clean Streams Law (35 P.S. §691.605) based upon an allegation that, on December 3, 1970, USS had discharged or permitted the discharge of industrial wastes, including great quantities of oil, from a sewer pipe discharge known as "outfall 3-28" into the Monongahela River, it being a navigable stream of the Commonwealth of Pennsylvania. It was alleged that the discharge was in violation of Section 307 of The Clean Streams Law (35 P.S. §691.307) and also contrary to Article 600, Section 10 of the Rules and Regulations of DER. The complaint was served on USS on or about May 8, 1971. USS filed an answer denying the allegations, whereupon the matter was set down for a hearing before a hearing examiner appointed by DER. The hearing, which lasted only one day, was held August 25, 1971.

By coincidence, and as a matter of interest, we note that the Act of December 3, 1970, P. L. 834, No. 275, 71 P.S. §§510-1 et seq., which made so many changes in The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, 71 P.S. §§51 et seq., became effective on the same date that the alleged violation in this case was charged, namely December 3, 1970. On that date, the Legislature provided for a separate "Environmental Hearing Board" by virtue of Section 20 of Act No. 275 (71 P.S. §510-21), in which section a hearing procedure was established, and under which DER could bring its charges against anyone alleged to be in violation of any of the Acts within the jurisdiction of DER. The Board was given the authority to make adjudications, together with the power to appoint hearing examiners. The Board, however, did not come into exist-

ence until February 15, 1972, following the proclamation of the Governor, which day, of course, was subsequent to the hearing in this case. USS contends that somehow its right to due process was violated by virtue of its hearing having been conducted before a hearing examiner of DER prior to the time that the Board was established. As we recently said in the case of *Pennsylvania Crime Commissioner v. Nacrelli*, 5 Pa. Commonwealth Ct. 551 (1972), the real meaning of due process of law is found within the term "fairness".

The Legislature anticipated the problems which might arise during the transition period when so many of the administrative agencies were being reformed and regrouped, and it provided, in Section 35 of Act No. 275 (effective January 19, 1971) at 71 P.S. §510-108 (b), that: "All powers granted by this act to the Environmental Hearing Board shall be exercised by the Department of Environmental Resources until the Governor has issued his proclamation stating that the Environmental Hearing Board is organized and ready to perform the powers, duties and responsibilities granted to it by this act." The reason for this section is obvious; the Legislature realized that it could not hold all of such environmental problems in a hiatus or an undeclared moratorium until the Environmental Hearing Board was formally organized. It authorized DER to proceed as it had, under prior statutes. In view of the fact that the Board is specifically permitted to hold hearings through appointed hearing examiners, and did so in this case, we conclude that there has been no depletion of any rights under the theory of due process of law to USS in this case.

We have reviewed very carefully the entire proceeding and find that it was accomplished in a fair manner. USS was provided with all of the notices, opportunities and rights to which it was entitled in this case. In administrative law, it is quite common for testimony

and evidence to be presented to a hearing examiner, after which the adjudicatory body renders its decision, based upon the record made. This case is clearly distinguishable from the cases relied upon by USS, namely *Gardner v. Repasky,* 434 Pa. 126, 252 A. 2d 704 (1969) ; *Schlesinger Appeal,* 404 Pa. 584, 172 A. 2d 835 (1961) ; *Donnon v. Downington Civil Service Commission,* 3 Pa. Commonwealth Ct. 366, 283 A. 2d 92 (1971).

The record in this case establishes that on October 7, 1970, USS secured the appropriate permits from DER for the construction of a water treatment facility intended to treat the effluent contained in its outfall 3-28, running into the Monongahela River. On December 3, 1970, this facility was still under construction, and it became operational on March 25, 1971.

On or about December 3, 1970, officials of DER received reports of a water pollution condition on the Monongahela River somewhere between the Homestead and Rankin Bridges. On that date, DER sent one of its environmental protection specialists, Ms. Margaret Belli (Belli), to investigate. Belli, together with a representative of the United States Coast Guard, proceeded downstream in a small motor boat. As they approached the Pittsburgh and Lake Erie Railroad Bridge, the southerly pier of which is close to outfall 3-28, they noticed an "iridescent" slick or "sheen" on the water. Upon investigation, Belli and the Coast Guardsman, both of whom were witnesses, observed brownish-black specks, or nodules, in a fluid running at the rate of about 2,000 gallons per minutes, which, when combined with the river water, spread out into larger iridescent areas flowing downstream. Belli took three samples of the river water, under what is described as a "grab sample" technique. Under this technique, a bottle about seven inches high, designed to contain about a pint of liquid, is pushed under the surface until it is filled within about one-quarter inch

from the top, whereupon it is removed, sealed and marked. Belli took three samples, the first of which was taken at a point approximately one foot below the point at which the discharge from USS outfall 3-28 entered the river. The liquid in this first sample Belli observed to be "brownish" and "blackish," especially near the top level. The second sample was taken approximately 350 feet downstream from outfall 3-28, and Belli observed this water to be iridescent. The third sample was collected at a point approximately 300 feet upstream of outfall 3-28, and Belli testified that there was no iridescence or brownish-black liquid in this third bottle. Belli testified that it was not possible to obtain a sample directly from the outfall because of the danger involved in bringing the boat too close to the discharge. This danger was verified by the Coast Guardsman, who had more than 25 years of military experience, a great deal of which involved small boats. Following the collection of the sample, Belli phoned in her report to her superior and received permission to proceed to the site of the Homestead Works of USS, wherefrom outfall 3-28 came. The Homestead Works is a large integrated steel mill engaged in the manufacturing of steel, part of which involves the circulation of water through various operating production units, primarily for cooling. One of the results of this steel-washing process is that oils and other solids are contained in the used waters. USS, realizing this pollution problem, had established "scale pits" inside the mill, which apparently were unsatisfactory, in view of the fact that USS was constructing its new treatment plant, as mentioned hereinbefore.

Belli and the Coast Guardsman appeared immediately after their investigation at the plant site and gained admittance to the plant. They met at least two USS personnel who had some authority in pollution matters. Neither Belli nor the Coast Guardsman was

able to observe the outfall or take further samples from inside the plant because of the terrain at the outfall site. Belli advised the USS officials on the scene of the taking of the samples. The apparent reaction of the USS employes was that they had regular inspections through their employes, and they had no reports of any discharge which they considered to be in violation of the law on that day. One of the more interesting aspects of this record is that USS at no time offered any testimony or evidence that it had not violated the law through a discharge of pollution into the Monongahela River as alleged by DER. USS was satisfied with its defense made through an attack upon the credibility of DER's witnesses and its attempt to develop what we deem to be hypertechnical arguments concerning the facts. USS never produced any employe who made an inspection of the scene on December 3, 1970. It did not present any tests it made on that date, although certainly the opportunity was presented to it by virtue of the disclosure by Belli.

On the merits of the case, USS relies upon an argument developed through three opinions of this Court, namely, *A. P. Weaver & Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 284 A. 2d 515 (1971); wealth Ct. 441, 279 A. 2d 388 (1971); and *North American Coal Corporation v. Commonwealth,* 2 Pa. Commonwealth Ct. 469, 279 A. 2d 356 (1971). In the *A. P. Weaver* case, we held that DER would be held to the burden of supporting its allegations by "substantial evidence." We reiterate everything we said there. In this case, the record made presents adequate, substantial evidence from which a reasonable man could conclude that the discharge from USS outfall 3-28 contained sufficient oily substance so as to cause a heavy iridescence in violation of Section 307 of The Clean Streams Law (35 P.S. §691.307). This section reads

as follows: "No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the board or such person or municipality has first obtained a permit from the department. . . . A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the board is hereby declared to be a nuisance."

The first section of The Clean Streams Act sets forth the definition of industrial waste. At 35 P.S. §691.1, it is stated: " 'Industrial waste' shall be construed to mean any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any esablishment, as herein defined. . . . 'Industrial waste' shall include all such substances whether or not generally characterized as waste."

Article 600, Section 10 of the Rules and Regulations of the Sanitary Water Board (since the reorganization, now adopted by DER) reads as follows: "Waste waters discharged to the waters of the Commonwealth shall show no more than a slight iridescence and shall at no time contain more than 30 ppm of oil or such lesser amount as the Board may specify for a particular stream as being necessary for the proper protection of the public interests therein."

As the Board concluded and USS contended, the record does not permit a finding of the oil content in the discharge from outfall 3-28, because Belli was not able to obtain a sample directly from the flow of that effluent. Somehow USS has interpreted our opinions in *Bortz, supra,* and *North American Coal, supra,* to mean that failure to do the impossible will prohibit DER from enforcing the law and its rules and regulations. This Court has never intended such a result.

The holdings of this Court in *Bortz, supra,* and *North American, supra,* are that where there are scientific methods reasonably available to the Commonwealth it must utilize such methods to prove its case, rather than rely upon visual observation without such readily available scientific tests. We stated very clearly in *Bortz, supra*: "In the event it should occur in a case that there is no scientific measurement instrument, or no method for determining a violation, then, as in all adjudicated matters in this Commonwealth, violations will have to be determined upon the weight of the evidence produced." 2 Pa. Commonwealth Ct. at 458, 279 A. 2d at 398. In *North American, supra,* we stated: "We want to make it clear that visual tests do constitute admissible evidence as a test, but, nevertheless, when recognized scientific tests are available and practical, courts must insist upon their use and presentation. If there are no scientific tests possible or available, these circumstances must be explained upon the record. In such a case extraordinary care should be taken to make certain that the visual tests are made accurately and fairly and constitute sufficient proof to sustain the opinions of the experts presented." 2 Pa. Commonwealth Ct. at 477, 279 A. 2d at 360.

Without reservation, our review of the record made in this case clearly establishes that in addition to the visual observations, the Commonwealth investigator obtained sufficient credible evidence which was later scientifically proven to contain sufficient effluent at the point of discharge so as to establish the violation alleged and found by DER and the Board in this case. The detailed explanation of the procedures carried out by Belli and her partner at the three points, mentioned hereinbefore, is a reasonable approach to the presentation of a prima facie case of a violation. Upon the presentation of such evidence, it was incumbent upon the respondent, USS, to either destroy or weaken this

evidence through cross-examination or offer rebuttal to it. After USS's opportunity to present its defense in the case, the Board had the duty to determine whether or not the violation existed upon the evidence presented. This is not a case like *Bortz,* where the State employe walks upon the railroad bridge and looks down on the water to report that the discharge from outfall 3-28 contained a specific amount of waste material so as to be in violation of some technical rule or regulation of the Board. This is a case where the State investigator obtained samples, which were later tested by competent State chemists who determined the oil content and the type of oil contained in the samples obtained. Belli's approach to this violation was well within what the Legislature intended, and the law requires, for the establishment of a violation. USS has not offered one explanation why it did not present a witness who observed the scene on December 3, 1970, or one test that it could have made within a matter of hours after DER's tests were made. As a result, the only substantial evidence which has been presented in this case was presented by DER, and it remains unrefuted in the record.

We conclude, therefore, that the record in this case supports, with substantial evidence, the findings and conclusions of the Board that USS on December 3, 1970, at its outfall 3-28 violated Section 307 of The Clean Streams Law and DER's Regulation Article 600, §10. In passing, we note that the Board concluded that USS was also in violation of Section 401 of The Clean Streams Law, 35 P.S. §691.401, which reads: "It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein

defined. Any such discharge is hereby declared to be a nuisance.''

The first section of the Act, 35 P.S. §691.1, defines pollution as follows: " 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical or biological properties of such waters or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The board shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.''

USS contends that because the original complaint does not specifically mention Section 401 of the Act as being a charge of the violation, it was improper for the Board to hold USS in violation of such an unspecified section of The Clean Streams Law. USS is correct in its contention, if the complaint does not put it on notice that it is being charged with such a violation. The problem with USS's contention, however, is that paragraph 4 of the complaint is sufficient in content, although admittedly general in nature, to put USS on notice that it was in violation of the provisions of Section 401. If we were in the business of rendering advice to DER, we would recommend that it specifically mention each and every section of which it charges a citizen of being in violation—rather than relying on general statements. It could happen in a case that the

general statements would not be sufficient to alert a citizen, or put him on notice, of a specific charge being made by DER. In this case, however, we believe it makes no difference in the ultimate outcome, and therefore is not passed upon.

The last contention of USS creates a more difficult problem for this Court. That problem arises out of the fact that when the adjudication was issued on May 31, 1972, the civil penalty found and assessed by the Board was set at $2,000. This figure was filed and published. The following day a correction was made to the adjudication amending it to read "$5,000" in place of the "$2,000" figure. The order attached to the adjudication indicates that "5" was superimposed upon the "2", and the "2" was not fully erased. There is no explanation on the record whatsoever for this discrepancy, and there is no reason given for the increase in the civil penalty finally assessed.

The authority for civil penalties is found in Section 605 of the Act, 35 P.S. §691.605, wherein it is stated: "In addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act or a rule or regulation of the board or an order of the department, the board, after hearing, may assess a civil penalty upon a person or municipality for such violation. Such a penalty may be assessed whether or not the violation was wilful. The civil penalty so assessed shall not exceed ten thousand dollars ($10,000) plus five hundred dollars ($500) for each day of continuing violation. In determining the amount of the civil penalty the board shall consider the wilfullness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost or restoration, and other relevant factors." The only mention in the adjudication concerning the basis for the civil penalty is the Board's reference to its assertion that the violation need not be wilful for the assessment

of a penalty, and its general statement that an oil slick spreading downstream into the Monongahela River obviously does damage to the waters of the Commonwealth. There is no other mention of any basis for the penalty. It is likewise interesting to note that the adjudication does not refer to facts in the record which indicate that USS filed regular reports on its discharge through outfall 3-28. Because of the permit it issued to USS, DER had full knowledge of the intent of USS to correct this pollution problem through the construction of the water treatment plant (then under construction on December 3, 1970, at outfall 3-28). Whether the Board gave any consideration to the good faith of USS in trying to correct this pollution problem by the expenditure of such funds under and by virtue of permits issued by DER is not known. Under the existing law, however, we cannot second-guess the imposition of the penalties. Generally speaking, we must find an error of law or an abuse of discretion before we can modify a penalty in question. *See Poisson v. State Harness Racing Commission,* 5 Pa. Commonwealth Ct. 20, 287 A. 2d 852 (1972) ; *State Real Estate Commission v. O'Data,* 1 Pa. Commonwealth Ct. 286, 274 A. 2d 232 (1972) ; *State Real Estate Commission v. Bewley,* 1 Pa. Commonwealth Ct. 85, 272 A. 2d 531 (1971). As we have already concluded, the record establishes sufficient substantial evidence to support the charge of a violation. This conclusion permits the imposition of a penalty. The Board's first published conclusion was that this penalty should be in the amount of $2,000. Without any explanation on the record as to the basis for a change of that penalty to a higher $5,000 penalty, such a change cannot be supported in the law. In other words, the Board's final order cannot be supported by the conclusions it first published. Therefore, this matter must be remanded back to the Board for the purpose of amending its order to coincide with its conclusion

that the civil penalty should be set at $2,000. If a mistake was made, the Board should have disclosed or called a hearing for the purpose of disclosing, the basis of the mistake, giving USS the opportunity to determine why the published initial conclusion of the Board was in error.[1] For purposes of clarity, our reading of the record in this case leads us to conclude that any civil penalty imposed in excess of $2,000 would strike at one's conscience as being unreasonable and would not "fit" the statutory violation. *See State Real Estate Commission v. Bewley, supra.*

We therefore

### ORDER

AND Now, this 6th day of February, 1973, based upon the foregoing opinion, the within matter is remanded back to the Environmental Hearing Board for the purpose of amending its final order dated May 31, 1972, to be consistent with its first published conclusions in its adjudication so that the civil penalty is set at $2,000, with all other provisions of said order to remain as stated therein.

---

[1] *See West Penn Power Company v. Pa. Public Utility Commission*, 174 Pa. Superior Ct. 123, 100 A. 2d 110 (1953).