## Department of Environmental Resources v. Berks Associates, Inc.

Before Broughton, Chairman, and Waters, Member of the Board.

*Pace Reich,* for Appellant.

*Hershel J. Richman,* for Department of Environmental Resources.

BROUGHTON, Chairman of the Board, July 31, 1973.—This is a civil penalties case brought by the Department of Environmental Resources ("department"), against Berks Associates, Inc., ("Berks") a corporation that operates a plant in Douglasville, Pa., in which it rerefines—recycles - used automobile crankcase oil. The complaint is based on an alleged discharge of approximately 3,000,000 gallons of waste sludge from one or more lagoons at defendant's plant on November 13, 1970. Hearings were held before the

Hon. Michael H. Malin, then Chairman of the Environmental Hearing Board, on October 30, 1972, and October 31, 1972, at the State Office Building in Philadelphia.

The board makes the following

## FINDINGS OF FACT

(1) Berks is a Pennsylvania Corporation, having its principal place of business in Douglasville, Union Township, Berks County, Pa.

(2) At its principal place of business, Berks is engaged in the reprocessing of used automobile crankcase oil.

(3) In connection therewith, certain residuals or waste products are produced which, as of November 13, 1970, were stored in lagoons on Berks premises.

(4) The lagoons are adjacent to the Schuylkill River, upstream from several municipal water supply intakes, including those for Pottsville and Phoenixville, Pa.

(5) The waste material in said lagoons consisted of residuals from the rerefining process consisting of various long chain hydrocarbons, derived from motor oil and gasoline, and lead compounds derived from gasoline.

(6) On November 13, 1970, following several days of rain, two lagoon walls gave way, releasing approximately 3,000,000 gallons of oil compounds into the Schuylkill River.

(7) Prior to the break on November 13, 1970, the lagoons had less than two feet of "freeboard," which is the vertical distance between the top of the liquid and the top of the lagoon wall, on several occasions; in addition, the walls were in places excessively narrow and in need of shoring up.

(8) Berks had, previously to the breach on November 13, 1970, been notified on numerous occasions by

the department that, in the department's opinion, the lagoon walls needed strenghthening.

(9) Following the discharge, the Commonwealth, including the Department of Environmental Resources or its predecessor, and the Fish Commission, expended $8,680.45 in monitoring, testings and various other activities related to determining the magnitude of the danger to the public from said spill, and protecting the public from said danger.

(10) The Federal government also became involved extensively in the monitoring and cleanup effort following the discharge.

(11) The concentration of lead in the material in the lagoon was tested, prior to the spill, at 10,000 parts per million (ppm). Phenol concentrations were also high. This was widely reported to and known by the officials who were monitoring the effects of the discharge.

(12) Because of the spill, a number of municipal water companies were forced to shut down for varying periods of time.

(13) Following the discharge, at least a 30-mile stretch of both banks of the Schuylkill River was covered with oil.

(14) In Fairmount Park, Philadelphia, following the discharge and because of it, several hundred geese were unable to fly.

(15) According to one Commonwealth witness, this was the largest oil spill he had ever seen, aside from those caused by Agnes.

(16) Given the magnitude of the discharge, and the reported, and plausible, concentrations of lead in the discharged material, the activities of the Commonwealth, local governments, and the Federal government were reasonable.

(17) Between November 10, 1970, and November 13, 1970, approximately 2¼ to 2½ inches of rain fell in the vicinity of Berks' plant.

(18) Had the lagoons been properly maintained, with the required amount of freeboard, the breach and discharge would not have occurred.

(19) Berks spent approximately $40,000 prior to the discharge in question investigating ways to reuse the waste material that had been stored in the lagoons.

(20) As of the time of the hearing, Berks had discovered ways to reuse the material formerly disposed of in the lagoons, and the lagoons had been filled in and were no longer being used.

(21) Shortly following the discharge in question, Berks filed a petition in the United States District Court for the Eastern District of Pennsylvania for an arrangement with creditors under Subchapter XI of the Bankruptcy Act of July 1, 1898, as amended, 52 Stat. 913, 11 U.S.C. §786. (Exh. D-5)

(22) Said action was settled by Berks paying its creditors in full.

(23) Berks is not now insolvent, nor would an obligation in any amount up to and including $10,000 be such a hardship to Berks that insolvency would be made imminent or even probable.

## DISCUSSION

The only real issue raised is the amount of the civil penalties. See United States Steel Corp. v. Department of Environmental Resources, 7 Comm. Ct. 429, 441-42, 300 A.2d 508 (1973). With respect to this, several subsidiary legal issues were raised by department: (1) Whether the fact that the lagoons in question were no longer being used should be taken to reduce the penalty to zero; (2) whether defendant's precarious

financial condition should be taken into account; (3) whether the utility of defendant's operation with respect to other environmental problems not directly at issue in this case should be considered by the board in setting the amount of civil penalties; (4) the degree of fault or negligence on the part of Berks; (5) defendant also contests whether the expenditures made by the Commonwealth in connection with a discharge are relevant to setting the amount of civil penalties and, if so, whether the expenditures made by the department in this case were necessary and reasonable in connection with this spill.

(1) We do think that the fact the lagoons are no longer being used is relevant. One factor that can be used to assess the degree of wilfulness or negligence is whether defendant has taken steps to see that the incident will not be repeated. The fact that Berks is now recycling the waste material, and that a repetition of this incident will not occur, should be taken in mitigation of whatever civil penalties we assess; we do not conclude, as defendant would have us conclude, that a nominal penalty should be awarded on this ground, especially where, as here, other considerations argue for a very substantial penalty. Civil penalties are analogous to punitive *and* compensatory damages in courts. The listing of both wilfulness and harm to the waters of the Commonwealth as factors we must consider in assessing civil penalties almost forces this conclusion. See Prosser, Torts, 7-23 (4th Ed., 1971). The fact that this particular defendant can no longer be deterred from another similar violation, because of actions taken to correct the situation, may argue for lessened civil penalties (on the punitive side of the damage consideration), but that does not affect the compensatory damage aspect of civil penalties, nor does it necessarily argue for no punitive damage

whatsoever where, as here, corrective action should have been taken before the incident.

(2) With respect to whether defendant's precarious financial condition should be taken into consideration to reduce the penalties we assess, we do accept the argument that punitive damages, at least, should not be awarded in such a way as to bankrupt individuals or corporations altogether, although we think that argument is stronger as the degree of wilfulness becomes less.

Here, based on the facts, we cannot see that such a principle has any application. Defendant has simply not shown itself to be in precarious financial condition. Further, the degree of negligence here is substantial. Repeated warnings were issued by the department. Finally, almost predictably, two of the lagoon walls failed, and a large quantity of oil sludge poured into the Schuylkill River. The magnitude and chemical composition of the spill would justify a compensatory damage award of more than $10,000, the maximum that can be awarded, without any punitive damages being assessed at all. Under the circumstances, we do not think that defendant's claim of financial precariousness is at all relevant.

(3) Nor do we think that defendant's past or potential future contribution to saving oil or preventing waste oil from being poured into the sanitary sewers of Philadelphia by its recycling operation has any relevance. Most persons who pollute, we may conclude, are doing something that is otherwise useful to society. There may be exceptions, but those exceptions are not to be found in the ranks of electric power companies, steel companies, paper companies, housing contractors, or oil reprocessors. Cf. Lampert v. Reynolds Metals Co., 372 F. 2d 245 (C.A. 9, 1967). The legislature did not require the cessation of water

pollution only for those whose primary activities are not otherwise useful. It required the cessation of pollution for all of us. To try to assess the relative social utility of the primary activity of different polluters in every civil penalty action would engage us in endless debates, without any observable standard of comparison. We think such an exercise would be without benefit to litigants, frustrating to litigants and to us, and harmful to the ends the legislature sought to achieve by The Clean Streams Act.

(4) We have already commented upon the degree of fault on the part of Berks. Repeated warnings were given. The lagoons were overfilled and undermaintained. We cannot characterize the ultimate breach as willful, although we do conclude that there was great negligence.

(5) Are the expenditures made by the Commonwealth in the course of determining the extent of the damage and in trying to minimize it relevant? We think so.

Section 605 of The Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 PS §691.605, requires us to consider, inter alia, harm to the waters of the Commonwealth or its uses. The simple statement that 3,000,000 gallons of oil sludge containing high concentrations of lead and phenol were discharged suggests that damage was great. One measure of that harm is the cost of the actions taken to minimize it, and the cost of determining the extent of the damage. The latter is a necessary part of the former; it is not possible to know what to do to correct an incident such as this, or to minimize the damage, unless one has rather precise knowledge of the exact extent of the damage.

We do not say that the costs of departmental surveillance and corrective action should be automatically billed to defendant. To do so might be to imply the

converse: that when the department got to the scene of a spill too late to do anything such as it did here, then our evaluation of the "harm to the waters of the Commonwealth" should be reduced, perhaps even to zero. Such an argument would be patently specious. We say only that department's costs are relevant evidence when considering the amount of the harm to the waters of the Commonwealth, and its uses.[1]

Here, we also conclude that the expenditures were reasonable, under the circumstances. An emergency situation was created by defendant's negligence. A large oil spill, reported to contain 10,000 ppm lead, was coursing toward a number of municipal water intakes. The potential for injury to human health is obvious; the drinking water standard is 0.05 ppm 1/20-thousandths of what was in the spilled material. We cannot conclude that every man hour expended during this emergency was *necessary*; not enough testimony was submitted to reach that conclusion. We can and do conclude that, given this type of emergency, the man hours expended were *reasonable*.

We note that, in this case, the actual harm to the waters of the Commonwealth and its uses were substantial. The potential harm to both the water and especially its users was even greater. Given that the compensatory damage aspect of civil penalties in this

---

1. Unfortunately for defendant's argument, relative to the reasonableness of what it argued were duplicative expenditures by the department, by the Federal government and by local authorities, the reason for the relevance of the evidence, assuming such duplication was reasonable (given the emergency), would tend to mean that we should increase, not decrease, the total civil penalties. If it were reasonable for all the levels of government involved to act as they did to protect the river and its users, then it is not unreasonable to admit evidence of that total expenditure as probative of the value of the injury to the river and its uses.

case was easily as great as the maximum allowed by law, it is difficult to see how any partial mitigation of the punitive damage aspect due to any of the above factors can affect the ultimate outcome.

## CONCLUSION OF LAW

1. The Environmental Hearing Board has jurisdiction over this case and over the person of defendant.

2. Defendant's acts in negligently permitting a large quantity of sludge deriving from the reprocessing of automobile crankcase oil, and bearing various oil and gasoline residuals, including lead compounds and phenol, was in violation of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, sec. 401, as amended, 35 PS §691.401, and §§97.63 and 101.4 of the Regulations of the department.

3. In view of the high degree of negligence present in this case, combined with the high degree of harm to the waters of the Commonwealth, the board concludes that a penalty of $10,000, the maximum the law allows for a discharge of less than one day's duration, would be just and proper in this case.

## ORDER

And now, July 31, 1973, in accordance with section 605 of The Clean Streams Law, 35 PS §691.605, civil penalties are assessed against Berks Associates, Inc., in the amount of $10,000. This amount is due and payable into the Clean Water Fund immediately. The Prothonotary of Berks County is hereby ordered to enter these penalties as liens against any property of the aforesaid defendant Berks Associates, Inc., with interest at the rate of six percent per annum from the date hereof. No costs may be assessed upon the Commonwealth for entry of the lien on the docket.