## Department of Environmental Resources v. Federal Oil & Gas Co.

*Thomas M. Burke*, for Commonwealth.

*William C. Hurtt* and *David McNeil Olds*, for defendants.

DENWORTH and COHEN, *Members*, July 1, 1975—This is a civil penalty action brought by the Department of Environmental Resources (hereinafter DER) against Federal Oil and Gas Company (hereinafter Federal), the owner of a deep gas well prospect in McKean County, Pa., and Joyce Pipeline Company (hereinafter Joyce), the drilling company employed by Federal to drill the prospect. The complaint asks for civil penalties on two counts: first, that during the nine-day period (November 17—November 25, 1973) in which the gas well was being drilled, defendants were responsible for the continuous discharge of industrial wastes—namely, drilling fines, oil and silt—into the waters of the Commonwealth in violation of

sections 301 and 307 of The Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 PS §§691.301, 691.307; and, second, that defendants did not "design, implement or maintain a plan to prevent erosion and sedimentation" on the drilling site as required by §102.4 of the Regulations of DER, which was adopted under §402 of The Clean Streams Law, supra. DER alleges that defendants are jointly and severally liable on both counts for civil penalties, which DER requests should be imposed in the maximum amount—$14,500 for the first count ($10,000 plus $4,500 for continuous violations) and $10,000 for the second count.

## FINDINGS OF FACT

1. On September 18, 1973, Federal, a Pennsylvania corporation, was issued well drilling permit no. McK-10394 by the Oil and Gas Division of the Department of Environmental Resources to drill a gas well at site number one on the Onofrio well farm in Corydon Township in McKean County. The permit states that the operator is granted permission to drill the subject site "in accordance with pertinent legal requirements."

2. The drilling site was selected for Federal by an "independent petroleum geologist." A permit to drill the site was then obtained and the site located and prepared by John DePetro, a "consultant petroleum engineer" employed by Federal for this purpose.

3. The drilling site consisted of approximately 1.3 acres on the west side of Forest Road 176 in the Allegheny National Forest.

4. To prepare the site, Mr. DePetro's employe was instructed to bulldoze a road from Forest Road 176 onto the site, and to clear and grade the site.

The site was at an elevation approximately four to five feet above the road and sloped slightly from a direction northwest to southeast. The entrance road located on the eastern portion of the site was approximately 30 feet long and was graded at a slope of approximately 12 percent. Mr. DePetro's criteria for locating the road were that it be a short distance from the Forest Road onto the site and not too steep a grade.

5. No erosion control plan was developed in the preparation of the site or maintained at the site.

6. The U.S. Forestry Service checks on the preparation of drill sites to guard against erosion. At the direction of Donald Burge, a ranger for the Allegheny National Forest, a ten-inch sluice was placed in the ditch under the entrance road to conduct runoff water from above the entrance road to below the entrance road. Mr. Burge's office approved the preparation of the site.

7. Joyce, a sole proprietor doing business as Joyce Pipeline Company, was employed by Federal to drill the well.

8. Joyce constructed three sumps that were located in the eastern and southeastern portion of the site. In the drilling process, sumps are required for the purpose of catching and containing drilling fines, which are sandstone cuttings resulting from drilling into the ground. The cuttings are mixed with fluid and blown out a pipe from the drilling rig into the sumps.

9. Buck Lick Run is a native brook and brown trout stream that is annually stocked with fingerling sized trout. It flows in a northeast to southwest direction south of the gas well site. An unnamed tributary of Buck Lick Run, flowing north to south, runs adjacent to the gas well site. Buck Lick Run

flows into Sugar Run approximately two miles from the well site and Sugar Run flows into the Allegheny Reservoir approximately five miles from the site. Sugar Run is a productive native brook and brown trout stream that is stocked annually with trout from the Lamar National Fish Hatchery.

10. On November 17 and 18, 1973, drilling fines were being blown outside the sump and were discharging from the lower side of one of the sumps down the entrance road embankment into a wet weather ditch beside Forest Road 176 and from there into the unnamed tributary and into Buck Lick Run and on into Sugar Run and finally into the Allegheny Reservoir.

11. The drilling fines caused Buck Lick Run, which was clear above the entrance of the unnamed tributary, to have a distinctive white, milky appearance, which was visible, though progressively lighter, from the entrance of the unnamed tributary into Buck Lick Run all the way to the Allegheny Reservoir.

12. On November 17 and 18, 1973, oil from underneath the drilling machinery was observed discharging from the drilling site into Buck Lick Run by the same route described above. The oil caused a discoloration and sheen on Buck Lick Run for a distance of at least one mile.

13. The drilling operation was shut down once on November 20, and once on November 21, 1973, by the forester for the United States Forest Service because of the failure to contain drilling fines in the sumps.

14. By November 20, 1973, the leakage of drilling fines from under one sump had been stopped by lining that sump with a plastic liner.

15. On November 20, 1973, the water in Buck Lick Run was still slightly discolored from the drilling fines and silt and sediment, but the discharge of drilling fines had been stopped.

16. On November 20, 22, 23, 24 and 25, 1973, oil was discharging from the drilling site into Buck Lick Run by way of the wet weather ditch and the unnamed tributary. Such oil was observable as a sheen or irridescence on the surface of Buck Lick Run and occasionally on Sugar Run. No evidence of oil was present above the entrance of the unnamed tributary into Buck Lick Run.

17. Grab samples taken from stagnant pools in the wet weather ditch on the night of November 23, 1973, showed the presence of large amounts of oil.

18. On November 24 and 25, 1973, oil was found on rocks in Buck Lick Run below where the unnamed tributary entered Buck Lick Run.

19. All of the observations of oil in Buck Lick Run were visual. None of the representatives of the department or the Fish Commission who inspected the site at various times took samples of or measured the amount of oil in Buck Lick Run itself.

20. Grab samples taken November 28, 1973, showed nine parts per million of oil in the wet weather ditch and five parts per million of oil in the unnamed tributary.

21. During the nine-day period of the alleged violations—November 17 to November 25, 1973—the weather was usually rainy.

22. On November 25, 1973, silt and sediment were running off the drilling site at an accelerated rate—that is at a rate faster than would have occurred if the site was not cleared of vegetation and opened up by the bulldozed entrance road to allow

runoff into the wet weather ditch and the unnamed tributary.

23. On November 25, 1973, the runoff of silt and sediment from the site caused excessive turbidity in Buck Lick Run for a distance of some 400 yards.

24. On November 22, 1973, one dead trout and two physiologically depressed cottus were found in Buck Lick Run below the entrance of the unnamed tributary about one-half mile from the drilling rig.

25. The macroinvertebrate population of a stream constitutes the food supply for the fish in this stream. On November 19, 1973, there was a severe reduction (measured as 71.3 percent) in the macroinvertebrate population of Buck Lick Run below the entrance of the unnamed tributary. This severe reduction in the food supply could have been expected to lead to a curtailment of fish production and fishing in the affected area of Buck Lick Run for approximately one year. However, no evidence was produced to show whether this expected reduction actually occurred. By August of 1974, there was an improvement in the macroinvertebrate population in Buck Lick Run below the entrance of the unnamed tributary. Nevertheless, there was still existing a substantial decrease (measured as 42.4 percent) in the macroinvertebrate population in the affected area of Buck Lick Run.

26. In August 1974, there was no significant difference in the water quality of Buck Lick Run below the entrance of the unnamed tributary from that which was obtained above this point, although there existed small amounts of oil on several rocks below the entrance of the unnamed tributary.

27. Federal was aware of the discharge problems at the drilling site as early as November 20, 1973.

28. On a number of days during the drilling operation representatives of the department and/or the Pennsylvania Fish Commission talked with personnel from Joyce and/or Federal and requested that the discharges be stopped. Although some concern was shown, no real effort was made to stop the discharge of oil from the site, which was continuing on November 25th, the last day of drilling.

29. The well, which was nonproductive, was turned over to Kaylar Development Corporation, owner of the shallow mineral rights by contract dated December 5, 1973.

30. The Oil and Gas Department of DER did not begin notifying operators of the requirement for an erosion control plan for drilling operations until March of 1974, although Regulation section 102.4 was adopted in September of 1972.

31. In January 1974, a penalty of $1,000 was paid by Federal to the Pennsylvania Fish Commission. In his report made out at the time of payment, the Fish Commission representative, who was the most frequent observer of discharges from the site, characterized the pollution from the drilling site as "light" and its effect as "unknown."

## DISCUSSION

The issues in this case can conveniently be discussed under three subheadings:

(1) Were there violations of section 307 of The Clean Streams Law, supra, and section 102.4 of DER's rules and regulations, as alleged?

(2) To what extent are Federal and Joyce jointly and severally liable for any penalties that may be assessed?

(3) What is the appropriate amount of civil penalties to be assessed for any proven violations?

I. *Were there violations of section 307 of The Clean Streams Law, supra, and section 102.4 of the Department's rules and regulations, as alleged?*

A. Section 307 of The Clean Streams Law, supra.

The department has shown by a preponderance of the evidence in this case that there were discharges from defendant Federal's gas drilling site of drilling fines, oil, and, on one occasion at least, silt and sediment into the waters of the Commonwealth during the period from November 17, 1973, to November 25, 1973, while Federal's gas prospect was being drilled by Joyce. Indeed, defendants do not seriously argue that there were no discharges from the site, although they have claimed that the department has not shown a causal connection between the discharges from the drilling site or the machinery on the drilling site and the pollution of Buck Lick Run. We are not persuaded by those arguments. DER produced substantial evidence to show that drilling fines, oil and silt were discharged from the drilling site into Buck Lick Run during the period of the complaint.

Defendants make several arguments as to why these discharges, even if admitted, were not violations of The Clean Streams Law, supra. First, defendants argue that silt and drilling fines are not industrial wastes within the meaning of The Clean Streams Law, supra. Section 1 of the act defines the terms "establishment" and "industrial waste" as follows:

"'Establishment' shall be construed to include any industrial establishment, mill, factory, tan-

nery, paper or pulp mill, garage, oil refinery, oil well, boat, vessel, mine, coal colliery, breaker, coal processing operations, dredging operations, except where the dredger holds an unexpired and valid permit issued by the Pennsylvania Water and Power Resources Board prior to the effective date of this act, quarry, and each and every other industry or plant or works.

" 'Industrial waste' shall be construed to mean any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry, or from any establishment, as herein defined, and mine drainage, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers, or other coal processing operations. 'Industrial waste' shall include all such substances whether or not generally characterized as waste."

Federal argues that the term "silt" in the statutory definition of industrial waste refers only to silt from coal operations. Commonwealth v. Sechan Limestone Industries, Inc., 52 D. & C. 2d 10 (1970), aff'd 220 Pa. Superior Ct. 782, 286 A. 2d 406 (1972), held that silt, irrespective of whether it originated from coal mining operations, was within the statutory definition of "industrial waste" in The Clean Streams Law, supra. Applying the Sechan construction, if rock, debris, dirt or clay qualify as industrial wastes independent of coal operations, drilling fines would perforce fall within that category. However, we are of the opinion that Sechan must be limited to silt resulting from an industrial process. We do not think that silt resulting from erosion rather than an industrial process constitutes "industrial waste" within The Clean Streams Law, supra. Thus, any liability to be imposed on

defendants for the discharge of silt and sediment from the site must be related to Regulation section 102.4 rather than section 307 of The Clean Streams Law, supra.

Federal also argues that a gas well is not within the statutory definition of the term "establishment" and that drilling fines are not industrial wastes. On a parity of reasoning with Sechan, we must conclude that a gas well is an establishment within the meaning of The Clean Streams Law, supra, and that drilling fines are industrial wastes within the meaning of that act.

In Sechan, the court found that defendant's limestone mining operation was an establishment within the meaning of The Clean Streams Law, supra, either as a mine or a quarry or the type of industry, plant or works in the operation of which industrial wastes are produced, 52 D. & C. 2d at page 13. Similarly, while the statutory definition of establishment does not specifically list "gas well," there can be no doubt that a gas well is nevertheless within the intended scope of the statute. See U.S. v. Getty Oil, 3 Envir. Reptr. 1225 (S. D. Tex., 1971), in which the court concluded that a "production platform" from which oil had been discharged was by "common sense" to be included within the enumerated places from which such discharges were prohibited under the 1899 Refuse Act.

Defendants also argue that DER violated the rule of Bortz Coal Company v. Air Pollution Commission, 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971), and North American Coal Corporation v. Air Pollution Commission, 2 Pa. Commonwealth Ct. 469, 279 A. 2d 356 (1971), that visual observations are not adequate evidence of a violation where recognized scientific tests are available, because

DER did not present any scientific evidence as to the quantity of drilling fines, oil or silt present in Buck Lick Run on any particular date. We are of the opinion that defendant's reliance on Bortz and North American is unjustified under the facts of this case., United States Steel Corporation v. Department of Environmental Resources, 7 Pa. Commonwealth Ct. 429, 300 A. 2d 508 (1973), has limited the applicability of the Bortz and North American holdings in regard to scientific evidence. And see Rushton Mining Company v. Commonwealth, 16 Pa. Commonwealth Ct. 135, 328 A. 2d 185 (1974). Moreover, we believe that these cases are not applicable where the discharge itself is unauthorized.

Section 307 of The Clean Streams Law, supra, prohibits all discharges of industrial waste not authorized by a permit issued by DER or by rules and regulations adopted by that department. It is conceded that neither defendant had a permit from DER to discharge industrial wastes. However, it is claimed on behalf of defendants that 25 Pa. Code §97.63 specifically permits the discharges of oil involved in this case. Defendant's reliance on this regulation is patently unjustified. The regulation applies to quantities of oil permitted in "waste water discharges" from industrial processes. It has no applicability whatsoever to undiluted discharges of oil to waters of the Commonwealth.[1]

---

1. It might be noted that even if the applicability of section 97.63 were assumed, defendants have not shown that its discharges were within the stated limit by relying on the samples taken on November 28th, which showed nine parts per million of oil in the ditch water and five parts per million in the unnamed tributary. These samples were taken several days after the drilling had stopped and outside of the period for which

Of more relevance to the discharges in this case than 25 Pa. Code §97.63 are 25 Pa. Code §§97.54(b) and 97.55, which apply to producing oil and gas wells. These regulations prohibit the discharge of any amount of oil into the waters of the Commonwealth. While the gas well in this case is a non-producing one, we believe that the regulations which apply specifically to producing oil and gas wells have a greater degree of relevance to the facts of this case than does 25 Pa. Code §97.63.

Furthermore, it might be noted that, although oil can be measured, a major recognized test for the presence of oil under both Federal and State laws is a visual one—whether there is a "slight iridescence" or "sheen"—presumably because the presence of oil can be detected by observation alone. See, e.g., 40 C.F.R. §§110.3(b) and 110.1(e), adopted pursuant to §11(b)(3) of the Federal Water Pollution Control Act, 33 U.S.C. §1161(b)(3), and 25 Pa. Code §97.63. In sum, the visual observations of the Commonwealth witnesses that oil and drilling fines were discharging from the drilling site into Buck Lick Run were sufficient to establish a violation of section 307 of The Clean Streams Law, supra. Section 605 of The Clean Streams Law, supra, authorizes the imposition of penalties based on a daily standard for continuous violations. The evidence here established that the drilling fine pollution occurred on two days. The oil pollution was observed on six days. Since the statute clearly con-

---

penalties are sought. Large amounts of oil (as much oil as water by the examiner's observation) were present in the samples taken from the ditch water on November 23rd. It can be presumed from the drainage of this area that that oil had washed into the waters of the Commonwealth by November 28th.

templates the division of penalties for initial discharges and continuous violations, we think it is appropriate to break down the assessment of any penalties here into an assessment of a penalty for the initial discharges of drilling fines and oil, plus an assessment of daily penalties for the additional five days on which drilling fines and/or oil were discharging from the site.

B. Regulation section 102.4.

Section 102.4 of the Rules and Regulations of DER provides:

"All earth-moving activities within this Commonwealth shall be conducted in such a way as to prevent accelerated erosion and the resulting sedimentation. To accomplish this, all persons engaged in earth-moving activities shall design, implement, and maintain erosion and sedimentation control measures which effectively prevent accelerated erosion and sedimentation. These erosion and sedimentation measures shall be described in a plan set forth in §102.5 of this Title (relating to erosion and sedimentation control plan), and shall be available at all times at the site of the activity. The Department or its designee may, at their discretion, require this plan to be filed with the Department or its designee."

Earth-moving activity is defined in section 102.1 as "Any construction or other activity which disturbs the surface of the land including, but not limited to, excavations, embankments, land development, subdivision development, mineral extraction, and the moving, depositing, or storing of soil, rock, or earth."

In this case there was a violation of section 102.4 of the regulations in that earth-moving activity (clearing, grading and embankment) was required

for the preparation of the site and no erosion control plan was developed or maintained at the site. Although the site was prepared for defendant Federal by an independent contractor, for reasons discussed below, we conclude that Federal must be held responsible for this violation. Defendant Joyce, however, cannot be held responsible because, as the driller of the well, it cannot be described as a person engaged in earth-moving activities within the meaning of the Regulations.

Defendant Federal's argument that the Oil and Gas Division of DER did not begin notifying operators of the requirements for erosion control plans before March of 1974 does not excuse Federal from compliance with those regulations, which were adopted in September of 1972. 25 Pa. Code §102.1, et seq. (relating to earth-moving activities) duly adopted and published in accordance with the provisions of the Commonwealth Documents Law of July 31, 1968, P.L. 769 (No. 240), as amended, 45 PS §1101, et seq. (1974-1975 supp.). Thus, section 504 of the act, regarding constructive notice of documents published in accordance with its provisions, applies to Federal. Ignorantia legis neminem excusat. Federal, therefore, cannot escape its duty with regard to the aforementioned regulation by relying on the notice from the Oil and Gas Division of DER, approximately 1½ years after the adoption and promulgation of these regulations in the Pennsylvania Code.

While the failure to develop an erosion control plan by Federal may not have been willful, nevertheless, within the context of this case, it was a significant violation of the rules and regulations of DER relating to erosion control. The location and construction of the entrance road and the bulldoz-

ing away of vegetation on the site were a major contributing cause to the discharges from the drilling site into Buck Lick Run. The failure to take reasonable erosion control measures on the part of Federal Oil and Gas, as required under the regulations, cannot be excused by the fact that heavy rains occurred during this period. Had erosion control measures been taken, perhaps the heavy rains may have been a circumstance to be taken into consideration in mitigation of civil penalty assessments but that is not the case before us.

Defendants argue as to both counts in the complaint for civil penalties that their actions in connection with the discharges were not willful and that, therefore, they cannot be assessed civil penalties. Their position assumes that intent is an element of a violation of The Clean Streams Law, supra. Clearly, defendants are wrong in their contention in this regard. As we said in Township of Pleasant v. Department of Environmental Resources, EHB Docket No. 73-352-CP-C (issued March 14, 1975):

"Because of the manner in which the discharge in this matter took place, a question has arisen as to whether such was a discharge by Defendant municipality in violation of the Clean Streams Law, supra. It is clear that the discharge was not intentional as that term is understood in the law. However, nothing in the Clean Streams Law predicates a violation thereof on the intention of any party. Moreover, in Commonwealth v. Sonneborn, 164 Pa. Superior Ct. 493, 66 A. 2d 584 (1949) violations of the Clean Streams Law, supra, were characterized as malum prohibitum, so as to render wholly immaterial a party's intent in connection with a violation of that act."

Moreover, section 605 of The Clean Streams Law, supra, authorizes the imposition of civil penalties regardless of the fact that the violation may not have been willful. The element of willfulness is only to be taken into account in determining the amount of a civil penalty.

II. *To what extent are Federal and Joyce jointly and severally liable for any penalties that may be assessed?*

Defendant Federal claims that it may not be held responsible for the discharges of oil and drilling fines from the site for the reason that the cause of such discharges was not an activity or operation conducted by Federal or its employes. The fact that the activities causing the discharges were those of an independent contractor, Joyce, is not sufficient under the circumstances of this case to relieve Federal of its basic responsibility to comply with The Clean Streams Law, supra. The issue is the nature of the duty which Federal had with regard to the discharges of oil and drilling fines.

As lessee under a lease for the exploration and exploitation of the gas rights on the Onofrio tract, defendant Federal had such control over the surface of the leased land as would enable it to exercise its rights under the lease. Generally, the lessee of an oil and gas lease may occupy so much of the surface as is reasonably necessary for the purpose of extracting the gas or oil contemplated by the lease: 38 Am. Jur. 2d, Gas and Oil, §115. As a lawful occupier of the surface of the land subject to the oil and gas lease, the lessee would appear to have those duties with regard to the surface of the land which generally attached to those who lawfully occupy the surface. Therefore, inasmuch as a violation of section 307 of The Clean Streams Law, supra, does not

require a specific intent, we are of the opinion that Joyce and Federal are jointly and severally liable for the discharges of oil and drilling fines from the site of the gas well operation.

With regard to the failure to develop and implement an erosion control plan, it is apparent that this was not the responsibility of Joyce. Joyce was not "a person engaged in earthmoving activities" within the contemplation of 25 Pa. Code §102.1, et seq. and, therefore, cannot be charged with the violation of the regulations prevailing to develop and implement an erosion control plan.

III. *What is the appropriate amount of civil penalties to be assessed for the proven violations?*

Section 605 of The Clean Streams Law provides that in assessing the amount of a civil penalty, the board shall consider "the willfulness of the violation, damage or injury to the waters of the Commonwealth or their uses, cost of restoration, and other relevant factors." In this case it is clear that there were discharges of drilling fines and oil from defendant's drilling site into Buck Lick Run and that there was some damage to Buck Lick Run as a result. The amount of the damage, however, has not been shown to be great or, for that matter, calculable. We may take judicial notice that a trout stream requires a very high degree of water quality to support its population. See, e.g., 1 Grad, Treatise on Environmental Law, §3.01, pp. 3-18. The evidence here showed only minimal damage to fish in the stream. The significant harm from the discharges was to the macroinvertebrate aquatic population in Buck Lick Run below the entrance to the unnamed tributary, which was severely reduced by what one aquatic biologist thought was "a

catastrophic shock to the organisms." The harm that this could be expected to result in (aside from the damage to the aquatic life itself) was the loss of food for trout in the stream and hence the probable curtailment of fish production and fishing in the affected area for a period of at least a year. Tests taken in August of 1974 showed that the water quality in Buck Lick Run below the entrance of the unnamed tributary was normal and that the aquatic population at that location, while still reduced, had recovered by 28.9 percent since November of 1973. No evidence of an actual effect on fishing in the area was shown.

It did not appear that the initial discharges were the result of any willful action on the part of defendants. The leakage of oil from the machinery and drilling fines from the sump were clearly accidental. In the case of the drilling fines defendants did take remedial action within a relatively short time. The fact that defendants did not take steps to control the erosion and discharge of oil once they had been asked to do so is some evidence of willfulness.

In United States Steel Corporation v. Department of Environmental Resources, supra, the court emphasized the obligation of the board to articulate the basis for civil penalties in assessing such penalties. In this case no evidence that would serve as a basis for measuring the damage to Buck Lick Run was presented. No cost of restoration was demonstrated by the Commonwealth—apparently because no remedial action was undertaken by either the department or the Fish Commission. The representative of the Fish Commission in his report accompanying the penalty payment in January of 1974 characterized the pollution as "light" and in-

dicated that the damage to the stream was "unknown." The imposition of maximum penalties, as the Commonwealth requests, is clearly inappropriate in a case like this where the demonstrated harm was not great, no cost of restoration was shown, the initial violations were not willful and a penalty has already been paid to the Fish Commission, which is the agency most concerned with damage to trout streams.

We are mindful, however, that the imposition of civil penalties also functions as a deterrent. Recognizing the need to protect the trout streams of the Commonwealth and to discourage even minimal pollution of them, we feel the violations here require the imposition of civil penalties if for no other purpose than to remind defendants and others engaged in the well drilling business that they must take all necessary and diligent precautions to assure that their activities do not result in any discharges into the waters of the Commonwealth. Accordingly, basing its determination solely on the deterrent value of the penalties, the board assesses penalties in this case as follows: $1,000 for the initial discharges of industrial wastes under count one of the complaint, plus $100 per day for the continuous discharges of drilling fines and/or observed oil on November 19, 20, 23, 24 and 25, 1973, or a total of $1,500 to be assessed against Federal and Joyce jointly and severally; $1,000 for failure to maintain an erosion control plan under count two to be assessed against Federal individually.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the subject matter of this case and the parties before it.

2. Drilling fines are industrial wastes within the meaning of The Clean Streams Law.

3. One who occupies land as a lessee for the purpose of extracting oil or gas from the subsurface of the land cannot avoid liability for discharges in violation of The Clean Streams Law on the ground that the discharges were caused by an independent contractor.

4. Defendants Federal and Joyce violated section 301 of The Clean Streams Law by discharging industrial wastes—namely drilling fines and oil—into the waters of the Commonwealth while drilling Federal's gas well prospect in Corydon Township, McKean County, Pa., in the period between November 17 and November 25, 1973.

5. Defendants Federal and Joyce are jointly liable under section 605 of The Clean Streams Law for allowing the discharges of oil and drilling fines from the site to continue.

6. Defendant Federal violated §102.4 of the Rules and Regulations of the department by not designing, implementing or maintaining a plan to prevent erosion and sedimentation at its gas well drilling site.

7. Considering all the factors set forth in section 605 of The Clean Streams Law, the legal and proper assessment of civil penalties for violation of sections 301, 307 and 605 of The Clean Streams Law in this case is $1,000 for the initial discharges and $100 per day or a total of $500 for the days on which the discharges were continuing, to be assessed against defendants Federal and Joyce jointly and severally.

8. Considering all of the factors to be considered under section 605 of The Clean Streams Law, the legal and proper assessment of civil penalties for

violation of Regulation §102.4 of the Rules and Regulations of the department is $1,000 to be assessed against Federal individually.

### ORDER

And now, July 1, 1975, in accordance with section 605 of The Clean Streams Law of June 22, 1937, P.L. 1987, as amended, 35 PS §691.1, et seq., civil penalties are assessed against defendants Federal Oil and Gas Company and Joyce Pipeline Company, jointly and severally in the amount of $1,500 and against defendant Federal individually in the amount of $1,000.

This amount is due and payable into The Clean Water Fund immediately. The prothonotaries of Allegheny and McKean Counties are hereby ordered to enter these penalties as liens against any private property of the aforesaid defendants with interest at the rate of six percent per annum from the date hereof. No costs may be assessed upon the Commonwealth for entry of the lien on the docket.