## Commonwealth v. Dresser Manufacturing Company

*Gerald Grimaud,* for Commonwealth.

*V. Rock Grundmare, Jr.,* and *Edward Manino,* for defendant.

BROUGHTON, Chairman of the Board, July 31, 1973.—This is a civil penalties case brought by the Commonwealth of Pennsylvania, Department of Environmental Resources (hereinafter "department") against Dresser Manufacturing Division of Dresser Industries, Inc. (hereinafter "Dresser"), based on alleged discharges of oil to an unnamed tributary to Marsh Creek, a tributary of Pine Creek, from defendant's plant in Delmar Township near Wellsboro, Tioga County, Pa. (hereinafter "Wellsboro Plant").

Dresser makes pipe fittings at its Wellsboro plant. In the course of a number of different operations, various kinds of oil are used. It is the disposal of the residual-used-oil that is at issue in this case. Three

specific disposal problems were dealt with: (1) a subsurface disposal system for the overflow from the Bonderizer tanks, consisting of a septic tank and leach beds lying to the northeast of defendant's building. This, it was complained by the department and by at least one neighbor, resulted in pollution of groundwater, specifically wells used for drinking water in the vicinity of the plant; (2) metal turnings from the pipe-threading operations are placed in scrap carts, and the oil allowed to drain from them. This oil was originally drained to the ground, but, subsequently, a concrete trough and a holding tank were provided to receive these drippings, which were then hauled away; (3) oil emissions from a "concrete headwall"—a drainage pipe that discharged to the end of a drainage ditch to the east of (behind) the Wellsboro plant building, the end of the pipe being set in concrete in such a way as to form a "headwall" at the upper end of the ditch.

1. Factually, the first of these cannot be said to be well proved. It could reasonably be held that pollution of groundwater was proved to have occurred prior to July 31, 1970, but was corrected, or was not clearly proved not to have been corrected, following that date.

The date July 31, 1970, is significant because that is the date when section 605 of The Clean Streams Law of July 31, 1970, P.L. 653, amending the Act of June 22, 1937, P.L. 1987, as amended, 35 PS §691.605, permitting civil penalties for violations of The Clean Streams Law, became effective. It appears to have been the assumption of the department at the hearing that civil penalties could be assessed for violations prior to that date. We do not agree. To apply a remedy such as this to actions that took place prior to the statutory enactment of the remedy would be to subject persons who performed those acts to a substantially greater legal risk than they could have contemplated at the

time they performed the act. The fact that we may think the acts of defendant were bad should not affect our view of the fairness; we should not permit the unfairness of subjecting Dresser to a large financial liability that was not provided for by law at the time it did the acts that gave rise to the liability. See section 56 of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §556, which provides for a presumption against giving a law retroactive effect. We do not find any persuasive reasons for overcoming that presumption in this case.

There is a larger problem with assessing civil penalties against Dresser on account of pollution of groundwater from its underground disposal system, however. The complaint charges, specifically, a discharge "into a wet weather ditch and/or a storm water drain and/or Marsh Creek." Neither this board, nor Commonwealth Court, nor the Supreme Court, has yet decided exactly what detail is required in a complaint for civil penalties. Neither the statute nor our own Rules of Procedure resolve that question. We hold now that, as a matter of due process, defendant must be put on reasonable notice as to exactly what he (or she or it) is accused of. A complaint need not necessarily specify a violation in terms of milligrams per liter, type of oil, and the like. Pre-hearing memoranda and discovery may provide detail, but it should give notice sufficient in order . . . that defendant may know from the complaint itself what experts, for example, should be retained to rebut the accusations, what records should be examined to find whether there was a violation, and what corrective action should be taken to prevent a similar occurrence in the future. While it may be true as a technical matter of hydrology that underground water and surface water are inseparable, that fact does not necessarily prove that in any

particular instance a pollutant introduced into ground-water necessarily also pollutes any particular body or stream of surface water, or even surface waters generally. As a matter of due procees, we do not feel that the complaint in this case gives reasonable notice to defendant that it would have to defend against a charge of polluting groundwater.

Perhaps, in this case, where there was a month between the presentation of the department's evidence and the presentation of defendant's evidence, during which month defendant in fact hired an expert to investigate and rebut the groundwater pollution charges introduced by the Commonwealth at the first hearing, it could be argued that the lack of notice was not prejudicial. There are two answers to this: (a) Where due process is concerned, the outcome should not be allowed to depend on happenstance. Granted that defendant's expert made an investigation of the groundwater problem, it is not plausible that the investigation was as thorough as it could have been had notice been afforded earlier. To the extent it might have been more thorough, prejudice exists. (b) Given the duality of reasons for dismissing as to the ground-water pollution problem, a diminution in the quantum of prejudice resulting from the insufficiency of the complaint 's irrelevant.

2. The drainage from the scrap carts was the subject of numerous tests. Unfortunately, only one of these, of a sample taken January 28, 1973, specifies the concentration of the oil. In other samples, the presence of oil was confirmed by visual tests, some denominated "infrared" (I.R.) and/or "ultraviolet" (U.V.), with no use of chemical testing so far as we can tell. If the tests were spectroscopic in nature, they may well have been the best way of determining the identity of the oil. In some of the testing, this was apparently

the object. Spectroscopic investigation however, is not sufficient to determine concentration; even if it can be reliable with respect to some pollutants, even oil, quantitative analyses were not performed here.

The ruling of the Commonwealth Court in Bortz Coal Co. v. Commonwealth, 2 Comm. Ct. 441, 279 A. 2d 388 (1971), and North American Coal Corp. v. Commonwealth, 2 Comm. Ct. 469, 279 A. 2d 356 (1971), appears to us to state a principle analogous to the "best evidence rule," especially as that rule was formulated historically. See Cleary, McCormick on Evidence 559, et seq. (2d Ed., 1972).[1] Visual evidence of something like oil pollution is admissible and can be treated by us as substantial evidence of the existence of oil pollution (see section 44 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, 71 PS §1710.44), only if there is some good reason why laboratory analysis of the concentration of oil is not available. See also United States Steel Corp. v. Department of Environmental Resources, 7 Comm. Ct. 429, 437-8, 300 A. 2d 508, 512 (1973). Even in such a case, visual identification should probably be regarded somewhat cautiously, since other things can sometimes mimic oil, in terms of the irridescent appearance of an oily film on a water surface as that irridescence appears to the naked eye. See, e.g., in this case, Tr. 217-218.

Here, the tests that were made may have overcome the second caution. There were comparisons made, for

[1] See especially note 10, page 560, where Thayer, Preliminary Treatise on Evidence at the Common Law, 507 (1898), is quoted: "The fact that any given way of proof is all that a man has must be a strong arugment for receiving it if it be in a fair degree probative; *and the fact that a man does not produce the best evidence in his power must always afford strong ground of suspicion.*" (Italics supplied.)

example, between different samples so the material in the water may fairly be taken to have been oil. The problem is that the tests did not show concentrations; section 97.63 of the regulations of the department specifies that a violation exists if the concentration is over 30 milligrams per liter (ppm), or if oil is visible, *if and only if* there is a good reason why laboratory tests for concentrations were not available, as we interpret the opinion in Bortz, North American, and U.S. Steel, supra.

Here, there is no good reason why laboratory tests for concentrations were not available. Samples were taken and analyzed, apparently, by the same laboratory that analyzed the type of oil. Under the circumstances, we can find no good reason why quantitative chemical analyses to determine concentrations of oil were not made.

Accordingly, the only violation related to drippings from the scrap carts for which we can really justify assessing a penalty, on the basis of the evidence, is the violation occurring on January 28, 1971.

In that instance, the department's representative, Mr. Howard Stabley, accompanied a representative of the Fish Commission, Mr. Hoover, in response to an anonymous telephone complaint, to observe an employe of Dresser pumping out the holding tank that had been constructed to receive the drippings from the scrap carts. The two men arrived apparently as the pump was about to be shut down, and, after watching for several minutes, observed an employe come out of the Dresser building and withdraw a hose from the holding tank. They then engaged him, a Mr. Davis, in conversation and elicited from him the admission that he had been instructed to pump out the holding tank. There was some conflict in testimony as to whether Mr. Davis had been instructed to pump out oil or not. Dresser argued that he was instructed to

pump out only the surface water that would have flowed into the tank, the object being to avoid having to pay to truck away large quantities of rain water.

There was no testimony, however, that Mr. Davis was instructed to make the necessary calculations or observations to make certain that only water, not oil, was in fact pumped. As it happened, a sample was taken of the material that was discharged which showed 30 percent oil, equivalent to 300,000 parts per million, or about 10,000 *times* the amount allowed by law. Incredibly, neither the representative of the department nor the representative of the Fish Commission looked into the tank to see whether Mr. Davis had simply pumped until fluid stopped going through the pump or whether he had perhaps been watching to try to avoid pumping oil.

We do not have sufficient evidence, quite, to conclude that this discharge was willful. We can, and do, conclude that the discharge of oil in the concentration found could have occurred only as a result of a complete failure to take any precautions to insure it would not happen. While not willfulness, this is at least gross negligence, negligence so great as to be evidence of a complete disregard for the consequences of the action taken.

The third discharge complained of, the discharge of oil-bearing wastes from the drainpipe at the "concrete headwall," is subject to many of the same objections as outlined in our discussion of the scrap cart discharge above. Specifically, only two samples can be said to have revealed a concentration: (1) A sample taken March 14, 1972, by George Fetchko showed 760 ppm of oil; (2) a sample taken February 3, 1972, by George Fetchko showed oil, but the laboratory indicated that a separate bottle must be sent for the parts per million of oil.

With respect to the second, however, Mr. Fetchko

did indicate that in the collection bottle there was approximately one-half inch of oil. Simple arithmetic calculations reveal that the depth of liquid in the bottle would have to have been more than 13,888 feet in order for there to be one-half inch of oil and also an initial concentration of less than 30 ppm.[2] Unfortunately, we do not know how approximate Mr. Fetchko's "approximately one-half inch" was; even one-fourth inch of oil in the top of a bottle would almost undoubtedly be more than 30 ppm, however. The more important unknown is the shape of the sample bottle. We do not know that it was standard; we know nothing about it. If it had a very wide base and a very narrow neck, the imputed concentration might be significantly less.

Despite the fact that we can say that the concentration in this sample was probably greater than 30 ppm, we are not willing to bridge the uncertainties in such a way as to ultimately impose a monetary liability, based on this sample. The degree of uncertainty is simply too high.

Hence, we conclude that the only violation for which we can impose a civil penalty occurred on March 14, 1973. With respect to that violation, defendant argued that it was not fully known where the oil came from. It was alleged the pipe drained the nearby road, defendant's parking lot, and portions of the Wellsboro plant. Even if the oil was found emanated from the parking lot, we think that the defendant should be held responsible, based on the reasoning in the Pennsylvania Supreme Court's decision in Harmar Coal Co.

---

[2] 1,000,000 divided by 30 would give 333,333, the number of half-inches high the bottle would have to be in order to account for a concentration of 30 ppm., assuming the bottle was cylindrical, or at least that all sides were perpendicular to the bottom. 333,333 divided by 24 (the number of half-inches per foot) gives 13,888.

v. Department of Environmental Resources, 452 Pa. 77. Such drainage would be occasioned by defendant's operation, in the sense that if defendant were not operating its plant, the discharge would not occur. It would be defendant's responsibility to treat it.

But we are convinced that oil concentrations of this magnitude are unlikely to have emanated from either the parking lot or the road. There was no testimony that it was raining that day, or that any recent accident on the road had occurred that would be likely to result in any significant proportion of the contents of the discharge from the "concrete headwall." On the day in question the storm drains in the parking lot were lifted, and Mr. Fetchko testified "there was no visible flow in these storm grates." If there was no visible flow there, then there must not have been much storm water drainage from the road either. The only place left is the plant itself.

We conclude that the oil in the sample taken that day could only have come from defendant's Wellsboro plant.

Two legal defenses are raised with respect to the second charge, one of which also applies to the third. First, it is claimed that assessing a civil penalty for pumping out the holding tank on January 28, 1971, would be double jeopardy, since defendant has already paid a fine to the Pennsylvania Fish Commission. Technically this is a criminal fine even though paid under the "field settlement" provisions of sections 200 and 279 of the Fish Law of May 2, 1925, P. L. 448, as amended, 30 PS §§200, 279. Section 605 of The Clean Streams Law, supra, explicitly provides that civil penalties may be sought in addition to criminal penalties or injunctive relief. This, it seems to us, is proper: Commonwealth v. Diefenbacher, 14 Pa. Superior Ct. 264 (1900); Commonwealth v. McMenamin, 122 Pa.

Superior Ct. 91, 184 Atl. 679 (1936); and see Annotation, Conviction or acquittal in criminal prosecution as bar to action for statutory damages or penalty, 42 A. L. R. 2d 634 (1955). Civil penalties are analogous to damages in an intentional tort case, however, both compensatory and punitive. Cf. Prosser, Torts, 9-26 (4th ed. 1971). In a case where the act complained of was both an intentional tort and a crime, it might happen that defendant might pay a criminal penalty and also pay damages, both compensatory and punitive, to the injured party. In this case, the injured party is the public, and it does not seem to us to be double jeopardy to require payment into the Clean Water Fund a sum of money by way of civil penalties that will partially substitute for the unavailability of tort damages in a case where the injury is diffused so widely through the public that no particular citizen can reasonably recover individually: Samuelson, The Pure Theory of Public Expenditures, 36 Rev. of Economics and Statistics 387 (1954). The article filed with the supplemental brief of respondent on July 11, 1973, Polelle, The Illinois Environmental Protection Act: Constitutional Twilight Zone of Criminal and Civil Law, July, 1973, Illinois Bar Journal 584, presents some interesting arguments, but we are not convinced that they are correct as applied to the situation here. The Illinois statute appears to emphasize much the criminal aspects of the enforcement process. The Clean Streams Law is much more analogous to tort damages, compensatory and punitive, than to criminal process. We hold that the assessment of civil penalties in this case is not double jeopardy.

The second legal objection applies to both the second and the third pollution incidents, and would presumably also apply to the first, as well, were we not dismissing that on other grounds. That objection is

based on the department's letter of April 26, 1972, ordering defendant to clean up, and then stating:

"This Department is contemplating legal action against Dresser Manufacturing for the discharge of oil. However, in lieu of such legal action this Department will accept a contribution of $1,000 made payable to the Clean Water Fund as provided by Section A of the Clean Streams Law"—and there is a citation. In order to forestall such legal action, this contribution should be received in this office no later than May 15, 1972."

Dresser argues strenuously that this constituted attempted extortion within the meaning of section 318 of The Penal Code of June 24, 1939, P. L. 872, as amended, December 6, 1972, P. L. 1068, 18 PS §4702.

Our initial reaction was that, even if this was extortion, that might affect whether the perpetrator should be prosecuted for violation of the Penal Code, but it should not necessarily affect the question of whether defendant had or had not violated The Clean Streams Law, supra, and section 97.63 of the department's Regulations; nor does it affect what defendant's liability under that law ought to be, that is, what defendant ought to pay by way of civil penalties. On further consideration, however, the board's general "overseeing" or "supervisory" function with respect to the department (Act of June 4, 1945, P. L. 1388, 71 PS §510.21(b); McNabb v. United States, 318 U.S. 332 (1943); Rea v. United States, 350 U.S. 214 216-17 (1956); see Davis, Discretionary Justice, esp. 215, et seq. (1969)), would seem to require that we consider the propriety and fairness of departmental action even when the fundamental issue is whether an enforcement remedy should be imposed against someone whom (or which) the department is prosecuting: McNabb v. United States, supra; Rea v. United States, supra; Elkins v.

United States, 364 U.S. 206 (1960); Mapp v. Ohio, 367 U.S. 643, 646-655 (1961).

Considered in this light, we think that there is some merit in defendant's complaint. We do think it is clear that the quoted paragraph was based on an attempted settlement of an action pursuant to section 8(a) of The Clean Streams Law, supra, added by the Act of July 31, 1970, P. L. 653, 35 PS §691.8(a), and not section 8(b), 35 PS §691.8(b), as argued by defendant on oral argument. On the other hand, if they had paid the $1,000, as asked, what legal action would they have been protected against? Would they have been protected against civil penalties, criminal action, or all possible legal actions?

We do not think that the defect in the letter is serious enough to be considered extortion, though, as noted above, that question is not really within our jurisdiction. We have, in fact, been able to discover no case, including all of those cited by defendant in its briefs,[3] where the "threat" of an officer to use his legal office, in violation of the extortion provision of the Penal Code, supra, was to recover money for the Commonwealth itself. A fortiori, we doubt whether the Criminal Code applies where the legal action that was threatened and might have been brought would have required, by statutes, payment into the specific Commonwealth fund into which the officer sought to have payment made.

Furthermore, we do not go so far as to say that it is

---

[3] Commonwealth v. Francis, 201 Pa. Superior Ct. 313, 191 A.2d 884 (1963); Commonwealth v. Wilson, 30 Pa. Superior Ct. 26 (1906). A number of cases strongly imply by the way they define extortion that the crime is limited to the taking of money for the officer's own benefit. See, e,g., Commonwealth v. Burdell, 380 Pa. 43, 110 A.2d 193 (1955); Commonwealth v. Hopkins, 165 Pa. Superior Ct. 561, 69 A. 2d 428 (1949).

improper for the department to attempt to settle cases out of court prior to bringing any kind of legal action. Such settlement attempts are common in purely private litigation, and perfectly proper for the Department, so long as it is completely clear on both sides what the legal basis for such prelitigation settlement is, and as long as it is completely clear what legal action is being settled.

We do not think anything of the sort was completely clear in this case, however. The letter of April 26, 1972, or any letter of this type, should have been more specific. Defendant should not have been left to guess what legal action it would be protected against, and what the legal basis for the letter was, or left with the impression that there was something extortionate about the offer or compromise. The spirit, at least, of the requirement of due process and of the Administrative Agency Law, supra, was violated. We believe we have an obligation to see to it that this kind of violation does not occur. While the department is not obligated (see 71 PS §510.21) to follow the procedures set by the Administrative Agency Law, supra, we think it is obligated to act with fairness, especially in cases where this Board is not involved as a "safety valve" on these points. Based on this and on our overseeing or supervisory function relative to the Department's procedures, we will reduce the amount of the penalties somewhat, although not to zero, as requested by the defendant; Elkins v. United States, supra; Cf. People v. Cahan, 44 Cal. 2d 434, 282 P. 2d 905 (1955).

Relative to the amount of penalties, we have found that the January 28, 1971, discharge was substantial, and very close to willful. There was no testimony relative to the harm to the waters of the Commonwealth, nor of the cost of cleaning up. There was no testimony that Marsh Creek supported fish life, and was stocked; we can take judicial notice that oil is not

generally helpful to aquatic life, and that oil in drinking water tastes bad. We find that a penalty of $5,000 dollars would be proper. This is reduced by one-third based on the argument made above with respect to the letter of April 26, 1972.

Relative to the discharge of March 14, 1972, from the concrete headwall, there was no testimony relative to willfulness, the harm to the waters of the Commonwealth or the cost of cleaning up. There was not even, in this instance, any definitively conclusive testimony as to where the oil in question came from, though as noted above it is impossible to believe that the quantity of oil involved came from the road or parking lot. Again, we can take notice of the unhelpfulness of oil discharges to aquatic life, as a general matter. We find that a penalty of $1,000 would be proper; this is reduced by one-third, based on the argument made above with respect to the letter of April 26, 1972.

By way of summary, the board makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Defendant operates a plant in Delmar Township, Tioga County, Pa., near Wellsboro, where it uses oils of various kinds in connection with the manufacture of pipe fittings.

2. On January 28, 1971, defendant pumped water and oil, having a concentration substantially greater than 30 milligrams per liter, out of a holding tank at its Wellsboro Plant into the waters of the Commonwealth.

3. On March 14, 1972, defendant discharged oil having a concentration greater than 30 milligrams per liter into a ditch on its property, which ditch, if it was

not waters of the Commonwealth, drained into waters of the Commonwealth.

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the subject matter of this case, and over the person of defendant.

2. The acts of defendant, set forth in findings of fact numbered 2 and 3, supra, violated The Clean Streams Law, supra, and section 97.63 of the Regulations of the department, promulgated under The Clean Streams Law.

3. The letter of April 26, 1972, from the department to defendant, does not constitute extortion, within the meaning of the Penal Code, supra. Nevertheless, it is proper and desirable for this board to take the request for money contained in that letter into account in setting the amount of civil penalties.

4. The amount of $4,000 in civil penalties is just and proper in this case, considering all the factors required to be considered by us under section 605 of The Clean Streams Act, supra, 35 PS §691.605, including factors not expressly listed therein, but which we believe are relevant.

## ORDER

And now, July 31, 1973, it is ordered that defendant pay $4,000 civil penalties into The Clean Streams Fund. The Prothonotary of Tioga County is hereby ordered to enter these penalties as liens against any property of the aforesaid defendant, Dresser Manufacturing Company, with interest at the rate of six percent per annum from the date hereof. No costs may be assessed upon the Commonwealth for entry of the lien on the docket.